**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| IN RE TWITTER, INC. SHAREHOLDER DERIVATIVE LITIGATION | Case No. 1:18-cv-00062-MN<br><br>DEMAND FOR JURY TRIAL |
|---|---|

## [REDACTED] VERIFIED AMENDED STOCKHOLDER DERIVATIVE COMPLAINT

By and through their undersigned counsel, plaintiffs Jim Porter, Ernesto Espinoza, and Francis Fleming ("Plaintiffs") bring this stockholder derivative action on behalf of nominal defendant Twitter, Inc. ("Twitter" or the "Company"), and against certain current and former officers and directors of the Company for issuing false and misleading proxy statements in violation of section 14(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and for breaches of fiduciary duties, unjust enrichment, corporate waste, and insider selling. Plaintiffs make these allegations upon personal knowledge as to those allegations concerning themselves and, as to all other matters, upon the investigation of counsel, which includes without limitation: (a) review and analysis of non-public internal corporate books and records produced by Twitter to Plaintiffs in response to an inspection demand; (b) review and analysis of public filings made by Twitter and other related parties with the U.S. Securities and Exchange Commission ("SEC"); (c) review and analysis of press releases and other publications disseminated by certain of the defendants and other related non-parties; (d) review of news articles, stockholder communications, and postings on Twitter's website concerning the Company's public statements; (e) pleadings, papers, and any documents filed with and publicly available from the related pending securities fraud class action, *Shenwick v. Twitter, Inc. et al.*, Case No. 3:16-cv-05314 (N.D. Cal.) (the "Securities Class Action"); and (f) review of other publicly available information concerning Twitter and the Individual Defendants (defined below).

## NATURE AND SUMMARY OF THE ACTION

1.      This stockholder derivative action concerns the harm caused to Twitter by certain of its officers and directors, due to their role in issuing a series of false and misleading statements concerning Twitter's user growth and user engagement, the critical measurements used to determine Twitter's overall business growth, advertising reach, and ability to monetize its user base.  Since at least February 5, 2015 and continuing through the present (the "Relevant Period"), the Individual Defendants made, approved, certified, and permitted improper statements in the Company's press releases, investor conference calls and presentations, and quarterly and annual reports filed with the SEC.  In those public statements and SEC filings, the Individual Defendants painted a falsely optimistic picture that Twitter was successfully implementing product initiatives that were driving user growth and user engagement—which, in turn, were driving advertising revenue and overall growth.  To maintain this facade, the Individual Defendants concealed meaningful information from investors concerning Twitter's "Daily Average Users," the primary metric used by the Company to track user engagement during the Relevant Period, along with adverse trends showing that user growth and user engagement were actually stalling and on the decline.  The Individual Defendants' misconduct has resulted in significant harm to Twitter, including: billions of dollars in losses to the Company's market capitalization; costs incurred (and to be incurred) in connection with the litigation and potential resolution of the related Securities Class Action; costs incurred from compensation and benefits paid to the Individual Defendants based (at least in part) on Twitter's artificially-inflated stock price; costs incurred from the loss of Twitter customers' confidence in the Company's products; and harm to the Company's reputation within the business community and in the capital markets.

2.     Twitter is an online news and social networking service that enables users to send and read short 140-character messages called "tweets."  Registered Twitter users can follow other users and read and post tweets, while unregistered users can only read tweets.  Users can access Twitter through the Company's website interface, or through mobile devices using the Company's official Twitter application (or "app"), various third-party apps, or as so-called short message service ("SMS") "fast followers," who only interact with Twitter via SMS text messaging (collectively, Twitter's "online platforms").

3.     The vast majority of Twitter's revenue is derived through advertising, which is displayed in various forms on the Company's online platforms.  The Company's advertising revenue is driven by the total number of users on its online platforms at any given time (user growth) and the level of engagement or interaction of those users (user engagement) on such platforms.

4.     Twitter's management has historically relied on two metrics to track user growth and user engagement: (i) Monthly Active Users ("MAUs"), which measures the total number of users on Twitter's online platforms in a given month; and (ii) Timeline Views, which measures the frequency of MAUs' interaction on the platforms.  Both of these metrics were closely tracked by investors and analysts because they provided meaningful insight as to whether the Company would be able to continue to grow its advertising revenues.  These metrics were so important that Twitter's management discussed them at length in the Company's Initial Public Offering ("IPO") just a year earlier, and continued to discuss them during subsequent earnings calls.

5.     In the months preceding the start of the Relevant Period, Twitter was facing a slowdown in user growth and user engagement after years of surging growth.  The Individual Defendants were concerned that investors would discover that MAU growth would continue to

stagnate and, eventually, decline—a sure sign that the Company's overall growth was slowing down. Accordingly, a few months prior to the beginning of the Relevant Period, on November 12, 2014, the Individual Defendants caused Twitter to host an "Analyst Day" designed to stoke investor confidence and convey the message that both user growth and user engagement were ramping up and would continue to ramp up for the foreseeable future. During the Analyst Day, the Individual Defendants signaled that Twitter's MAUs were expected to increase significantly "to over 550 million monthly active users in the intermediate term and ... over a billion ... monthly active users over the longer term." At the same time, the Individual Defendants announced the launch of new products designed to drive growth in the number of monthly active users, as well as increase user engagement. By providing these optimistic growth projections during the Analyst Day, the Individual Defendants were able to assuage investors' concerns and keep the Company's stock price afloat.

6.     By the start of the Relevant Period, the Individual Defendants sought to maintain the false narrative that user growth and user engagement were on the upswing, when, in fact, those metrics showed signs of flattening and actual downward trending. So, over the course of the next several months, the Individual Defendants touted the purported success of the Company's growth initiatives in driving continued monthly active user growth. For example, in February 2015, the Individual Defendants boasted that "the business [was] advancing at a great pace," and proclaimed that "the absolute number of net users added in [the first quarter of 2015 would] be similar to what [Twitter] saw during the first three quarters of 2014." Twitter's then Chief Executive Officer ("CEO"), defendant Richard Costolo ("Costolo"), noted that recent user numbers indicated that the Company's monthly active user base was continuing to grow, in part as a result of recent "product initiatives."

7.     Also during the Relevant Period, the Individual Defendants sought to obfuscate important information about user engagement—a key driver of long-term MAU growth. Twitter's management went as far as hiding user engagement data from investors and routinely dodged questions posed by analysts concerning the subject. In particular, Twitter's management made it a point to conceal the fact that they were focused on tracking an alternative user engagement metric called "Daily Average Users," or DAUs, instead of the previously used Timeline Views metric. Rather than disclose meaningful information about DAU and user engagement trends, the Individual Defendants caused the Company to make positive statements indicating that user engagement was steadily increasing.

8.     By early April 2015, the SEC noticed that user engagement data was missing from Twitter's public filings and warned the Company of its obligation to disclose "metric(s) ... to explain trends in user engagement." But rather than make the required disclosure, the Individual Defendants misleadingly pointed the SEC to other metrics that had little to do with user engagement. And despite the SEC's clear warning and request for meaningful user engagement data, Twitter's management continued to dodge questions about user engagement and actively concealed from the public material information about that metric.

9.     The Individual Defendants' misconduct did not end there. On April 20, 2015, Twitter's Board of Directors (the "Board") caused a materially misleading Proxy Statement to be filed with the SEC (the "Proxy"), urging stockholders to vote to re-elect two of the directors, among other things. In seeking stockholder votes in accord with the Board's recommendations, the Proxy misrepresented and/or omitted material information concerning, among other things: (i) the failures of the Board and certain of its committees in fulfilling their duties, including with respect to oversight of internal controls and disclosures; (ii) that the Company was misrepresenting critical

metrics used to represent Twitter's success; and (iii) that user growth and user engagement were flat or declining.

10.    Non-public internal corporate books and records produced by Twitter to Plaintiffs make clear that ███████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████

11.    As a result of the false and misleading statements issued by the Individual Defendants concerning user growth and engagement, the Company's stock price rose dramatically, reaching artificially inflated prices as high as $52.87 per share during the Relevant Period.

12.    While the Company's stock price was artificially inflated, certain of the officers and directors of Twitter exploited their positions as corporate fiduciaries of the Company and, with knowledge of material, adverse, and non-public information regarding the Company's operations and business prospects, sold their personal stock holdings for hundreds of millions of dollars in insider profits.  These excessive insider sales are particularly glaring, given defendant Costolo's boastful comments during the May 2014 Annual Shareholder's meeting that "at the board level you haven't seen a single share sold, as of or since the IPO."

13.    The truth regarding the Individual Defendants' wrongdoing started to emerge in June 2015.  In particular, on June 11, 2015, defendant Costolo abruptly disclosed his plans to step down as CEO of Twitter.  Defendant Costolo's "resignation," more properly regarded by many as an ouster, came on the heels of Twitter's disastrous first quarter 2015 earnings report, in which the

Company lowered its full year 2015 revenue forecast to between $2.17 billion and $2.27 billion, as opposed to previous guidance of $2.3 billion to $2.35 billion. The Individual Defendants further caused the Company to disclose that MAUs had only increased 5% over the previous quarter. Defendant Jack Dorsey ("Dorsey"), Twitter's co-founder and Chairman of the Board, was appointed to serve as interim CEO for a few months before taking over the position permanently.

14. Notwithstanding these partial revelations, the full truth about the Individual Defendants' false and misleading statements concerning the Company's user growth and user engagement was not fully revealed until late July 2015. On July 28, 2015, after the close of the market, the Individual Defendants caused Twitter to issue a press release announcing the Company's second quarter 2015 financial results, which revealed that the Company's MAUs had increased by only 2 million users over the prior quarter, representing slight growth of less than 1%. During the ensuing conference call with investors and analysts, defendant Dorsey admitted that "[p]roduct initiatives we've mentioned in previous earnings calls … have not yet had meaningful impact," and that Twitter does "not expect to see sustained meaningful growth in MAUs [monthly active users]" for a "considerable period of time." Furthermore, defendant Anthony Noto ("Noto"), the Company's Chief Financial Officer ("CFO"), explained that Twitter was experiencing low user growth rate and would continue to experience "very low" growth in the foreseeable future:

> [I]n the near term, organic growth is going to be very low, as it was this quarter and as I think about Q3, it's marginally better. But I wouldn't want you to or anyone else to expect a change in our growth rate relative to what you're seeing this quarter. I think you'll see that for a while, and that was my point.

15. The market's response to these revelations was swift and severe. Twitter's stock price declined nearly 15% the following day, falling $5.30 per share to close at $31.24 on July 29, 2015, resulting in a loss of billions of dollars in market capitalization.

16.     Since the July 28, 2015 revelation, the Company has continued to report slow user growth, and Twitter's stock price has continued to decline.  Despite these poor financial results, Twitter's senior officers continue to be rewarded with lavish compensation, and have personally profited at the expense of the Company and its stockholders.

17.     Moreover, Twitter and certain of its officers and directors are now subject to the Securities Class Action pending in the U.S. District Court for the Northern District of California alleging violations of the federal securities law.  On October 16, 2017, the Honorable Jon S. Tigar, U.S. District Court Judge for the Northern District of California, sustained certain of plaintiffs' claims in the Securities Class Action on defendants' motion to dismiss, even under the heightened pleading requirements of the Private Securities Litigation Reform Act of 1995 and Rule 9(b) of the Federal Rules of Civil Procedure, including defendants' statements regarding "Twitter's MAU, ad engagement, timeline views, and DAU/MAU ratio."  A class has now been certified; the defendants' motion for summary judgment has been denied; and a case management conference to set deadlines, including a trial date, is set for July 8, 2020.

18.     Twitter's Board has not commenced, and will not commence, litigation against the Individual Defendants named in this complaint, let alone vigorously prosecute such claims, because they face a substantial likelihood of liability to Twitter for authorizing and failing to correct the false and misleading statements alleged herein, and for failing to correct and/or implement the necessary internal controls to prevent the harm to the Company that has occurred. Accordingly, a pre-suit demand upon the Board is a useless and futile act.  Thus, Plaintiffs rightfully bring this action to vindicate Twitter's rights against its wayward fiduciaries and hold them responsible for the damages they have caused Twitter.

## JURISDICTION AND VENUE

19.     Pursuant to 28 U.S.C. §1331 and section 27 of the Exchange Act, this Court has jurisdiction over the claims asserted herein for violations of section 14(a) of the Exchange Act and SEC Rule 14a-9 promulgated thereunder.  The Court has supplemental jurisdiction over the state law claims asserted herein pursuant to 28 U.S.C. §1367(a).  This action is not a collusive action designed to confer jurisdiction on a court of the United States that it would not otherwise have.

20.     The Court has jurisdiction over each defendant because each defendant is either a corporation that does sufficient business in Delaware, or is an individual who has sufficient minimum contacts with Delaware so as to render the exercise of jurisdiction by the Delaware courts permissible under traditional notions of fair play and substantial justice.

21.     Venue is proper in this Court in accordance with 28 U.S.C. §1391(a) because: (i) Twitter is incorporated in this District; (ii) one or more of the defendants either resides in or maintains executive offices in this District; (iii) a substantial portion of the transactions and wrongs complained of herein, including the defendants' primary participation in the wrongful acts detailed herein, and aiding and abetting and conspiracy in violation of fiduciary duties owed to Twitter, occurred in this District; and (iv) defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District.

22.     In connection with the acts and conduct alleged herein, defendants, directly and indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mail, interstate telephone communications, and the facilities of the national securities exchanges and markets.

# THE PARTIES

**Plaintiffs**

23.     Plaintiff Jim Porter was a stockholder of Twitter at the time of the wrongdoing complained of, has continuously been a stockholder since that time, and is a current Twitter stockholder.

24.     Plaintiff Ernesto Espinoza was a stockholder of Twitter at the time of the wrongdoing complained of, has continuously been a stockholder since that time, and is a current Twitter stockholder.

25.     Plaintiff Francis Fleming was a stockholder of Twitter at the time of the wrongdoing complained of, has continuously been a stockholder since that time, and is a current Twitter stockholder.

**Nominal Defendant**

26.     Nominal defendant Twitter is a Delaware corporation with its principal executive offices located at 1355 Market Street, Suite 900, San Francisco, California.  Twitter's self-titled primary platform allows people to consume, create, distribute and discover content in real time, and its secondary platform, Periscope, allows users to broadcast and watch video live with others on Twitter and desktop or mobile web browsers.  As of December 31, 2019, Twitter had 4,900 full-time employees.

**Individual Defendants**

27.     Defendant Dorsey is Twitter's CEO and has been since September 2015 and a director and has been since May 2007.  Defendant Dorsey was Twitter's interim CEO from July 2015 to September 2015; Chairman of the Board from October 2008 to September 2015; and President and CEO from May 2007 to October 2008.  Defendant Dorsey co-founded Twitter in

2007. Dorsey received $56,551 in compensation from Twitter in 2016, and $68,506 in compensation from Twitter in 2015. During the Relevant Period, while in possession of material, non-public information, Dorsey sold at least 75,630 personally held shares of Twitter stock at artificially inflated prices for proceeds of approximately $3.6 million.

28. Defendant David Rosenblatt ("Rosenblatt") is a Twitter director and has been since December 2010. During the Relevant Period, Rosenblatt was a member of the Nominating and Governance Committee and the Compensation Committee. Rosenblatt received $306,081 in total compensation from Twitter in 2019; $305,000 in total compensation from Twitter in 2018; $305,000 in total compensation from Twitter in 2017; $295,000 in total compensation from Twitter in 2016, and $295,000 in total compensation from Twitter in 2015.

29. Defendant Costolo was Twitter's CEO from October 2010 to July 2015; Chief Operating Officer from September 2009 to October 2010; and a director from September 2009 to September 2015. Defendant Costolo is named as a defendant in a related securities class action complaint that alleges he violated sections 10(b) and 20(a) of the Exchange Act. Costolo received $91,795 in compensation from Twitter in 2015.

30. Defendant Noto was Twitter's Chief Operating Officer from November 2016 to March 2018 and Chief Financial Officer from August 2014 to August 2017. Defendant Noto is named as a defendant in a related securities class action complaint that alleges he violated sections 10(b) and 20(a) of the Exchange Act. Noto received $1,266,559 in compensation from Twitter in 2017, $23,776,079 in compensation from Twitter in 2016, $401,281 in compensation from Twitter in 2015, and $72,768,098 in compensation from Twitter in 2014.

31. Defendant Evan Williams ("Williams") was a Twitter director from May 2007 to February 2019; Twitter's President and Chief Executive Officer from October 2008 to October

2010; Chief Financial Officer from July 2009 to March 2010; and Chief Product Officer from February 2008 to October 2008. Defendant Williams co-founded Twitter in 2007. Williams received $45,833 in compensation from Twitter in 2019, $275,000 in compensation from Twitter in 2018, $275,000 in compensation from Twitter in 2017, $275,000 in compensation from Twitter in 2016, and $131,250 in compensation from Twitter in 2015. During the Relevant Period, while in possession of material, non-public information, Williams sold many millions of personally held shares of Twitter stock at artificially inflated prices for proceeds of approximately $273.2 million.

32.　　Defendant Marjorie Scardino ("Scardino") was Twitter's Lead Independent Director from May 2016 to December 2018 and a director from December 2013 to December 2018. Defendant Scardino was a member of Twitter's Audit Committee from at least April 2014 to December 2018 and chair of the committee from October 2017 to January 2018. Scardino was also a member of the Compensation Committee. Defendant Scardino received $295,000 in compensation from Twitter in 2018, $315,000 in compensation from Twitter in 2017, $295,000 in compensation from Twitter in 2016, and $295,000 in compensation from Twitter in 2015.

33.　　Defendant Peter Fenton ("Fenton") was a Twitter director from February 2009 to May 2017. Defendant Fenton was also a member of Twitter's Audit Committee and the Chair of the Compensation Committee. Fenton received $305,000 in compensation from Twitter in 2016 and $305,000 in compensation from Twitter in 2015.

34.　　Defendant Peter Currie ("Currie") was Twitter's Lead Independent Director from at least April 2014 to May 2016 and a director from November 2010 to May 2016. Defendant Currie was also the Chairman of Twitter's Audit Committee and a member of that committee from at least April 2014 to May 2016. Currie received $315,000 in compensation from Twitter in 2015.

35.     Defendant Peter Chernin ("Chernin") was a Twitter director from November 2012 to May 2016.  Chernin served as Chairman of Twitter's Nominating and Corporate Governance Committee beginning on May 1, 2015.  As founder and chairman of the Chernin Group, LLC, Chernin held 50,000 restricted stock units, which vested in full by December 31, 2016.

36.     Defendants Costolo, Noto, Dorsey, Fenton, Rosenblatt, Scardino, Williams, Chernin, and Currie are sometimes referred to herein as the "Individual Defendants."

37.     Defendants Dorsey, Fenton, Rosenblatt, Scardino, Williams, Chernin, and Currie are sometimes referred to herein as the "Director Defendants."

38.     Defendants Fenton, Scardino, and Currie are sometimes referred to herein as the "Audit Committee Defendants."

39.     Defendants Dorsey and Williams are sometimes referred to herein as the "Insider Selling Defendants."

**Non-Party Director**

40.     Non-Defendant Omid R. Kordestani ("Kordestani") is a Twitter director and has been since October 2015.  Kordestani was Twitter's Executive Chairman from October 2015 to June 2020.  Despite only being employed in that capacity for less than two months, Kordestani received $12,361,615 in total compensation from Twitter in 2015.  As inducement to join Twitter, Kordestani received a grant of 800,000 non-qualified stock options.  The non-qualified stock options vest 25% on the first day of the month following Kordestani's twelve-month employment anniversary, and 6.25% are subject to quarterly vesting thereafter based on continued employment over the remainder of the vesting period.  Kordestani also received a grant of 400,000 performance-based restricted stock units ("PRSUs"), and will be eligible to earn 100,000 PRSUs at target in each of 2016 through 2019.  Twitter paid Kordestani compensation as follows:

| Year | Salary | Option Awards | Stock Awards | Total |
|---|---|---|---|---|
| 2017 | $50,000 | - | 2,032,800 | $2,082,800 |
| 2016 | $50,000 | - | $1,800,000 | $1,850,000 |
| 2015 | $9,615 | $12,352,000 | - | $12,361,615 |

## SUBSTANTIVE ALLEGATIONS

**Background to the Relevant Period**

41.     Twitter was founded in March 2006, and its online platform enabling users to send and read "tweets" was introduced to the public in July 2006.  After its launch, the Company experienced rapid growth, as Twitter users posted approximately 400,000 tweets per quarter by 2007.  By June 2010, Twitter users were posting around 65 million tweets per day, which jumped to 140 million tweets posted per day by March 2011.

42.     While its user base was experiencing exponential growth, Twitter filed for its IPO on September 12, 2013.  The IPO was completed on November 7, 2013, at $26 per share, with shares closing at $44.90 per share the same day.

43.     According to the Company, user growth and user engagement are key indicators of the Company's ongoing financial growth and success.  Indeed, user growth and user engagement were highlighted more than fifty times in Twitter's Registration Statement filed with the SEC on October 3, 2013, in connection with the Company's IPO, including for example, the following statements:

- "Growth in [Twitter's] user base and user engagement is a *fundamental driver* to the growth of [its] business."

- "User growth trends reflected in the number of MAUs [monthly active users], user engagement trends reflected in timeline views and timeline views per MAU … are *key factors* that affect [the Company's] revenue."

- "The size of [Twitter's] user base and [its] users' level of engagement are *critical* to [the Company's] success."

44.     Historically, Twitter's management has monitored and analyzed user growth and user engagement through the lens of two primary metrics: (i) Monthly Active Users, or MAUs, which measure the total number of users on Twitter's online platforms in a given month; and (ii) Timeline Views, a user engagement metric that measures the frequency by which MAUs interacted with the online platforms.

45.     Because Twitter's primary source of revenue is advertising, its growth prospects are largely driven by the number of users on its online platforms at any given time (user growth, measured by MAUs), as well as the level of engagement of users on such platforms (user engagement, historically measured by Timeline Views).  It is important to note that while user growth and user engagement are separate concepts, they are interrelated and are both fundamental to Twitter's overall financial growth.  In the Company's early days, it was not difficult for Twitter to find and add many new users to its online platforms, therefore resulting in expansive MAU growth.  But as time went on and new users became harder to find (resulting in slower MAU growth), the Company had to rely more on user engagement to increase the amount of time users spent on its online platforms and to keep them from quitting Twitter altogether (i.e., "user churn").  In that sense, user engagement has a direct impact on long-term MAU growth.

46.     Thus, in order to grow its advertising revenues and overall business, Twitter was faced with the challenge of continuously driving users to its online platforms, as well as keeping those users engaged so that they spent more time on the platforms, and thereby exposing users to more advertisements and ultimately "monetizing" them.  Not surprisingly then, investors and

analysts closely tracked user growth and user engagement, as both metrics provided key insight as to whether Twitter would be able to continue to grow.

47.    For several years, and through the end of 2014, Twitter was largely successful in achieving regular monthly active user growth.  However, as detailed in the following chart, by late 2014, the Company's active user growth began to stagnate:



48.    In the months preceding the beginning of the Relevant Period, investors and analysts were concerned about the slowdown in Twitter's user growth and the impact it would have on the Company's revenue stream and growth prospects.  The Individual Defendants sought to reassure the market that the Company was implementing new product initiatives that would accelerate MAU growth and drive user engagement.  For example, on November 12, 2014, Twitter's senior management, including defendants Costolo and Noto, hosted an eight-hour "Analyst Day" to convey the unified message that user growth and user engagement were on an upward trajectory, and not stalling.  During the Analyst Day, Twitter's management announced

that new product initiatives were expected to effectively **double** Twitter's monthly active users from around 284 million MAUs to "**to over 550 million monthly active users in the intermediate term and ... over a billion** ... monthly active users over the longer term." Defendant Noto touted the Company's significant product roadmap and the impact it would have on significantly increasing MAU growth:

> We think we have a significant product roadmap, much of which hasn't been launched yet that [we] believe positions us to grow our monthly active users by 2x to over 550 million in the intermediate term and 3-4x to over a billion core users, monthly active users over the longer term.

49.     Defendant Noto's remarks were accompanied by the following slide, which, purportedly as a result of the Company's new "Strategy Implications," predicted rapid, exponential monthly active user growth. This slide presents three different MAU growth projections, with the most conservative projection at 15% annual growth and over 500 million MAUs by 2018, and the most optimistic projection calling for 40% annual growth and over 1.2 billion MAUs by 2018:



**STRATEGY IMPLICATIONS**

50.    According to defendant Noto, the way to achieve this aggressive MAU growth was to "build an engaging experience ... to have those users be engaged [and] stay engaged."  In other words, in order to spur MAU growth, Twitter had to increase user engagement.  And, by "driv[ing] engagement," each of those users could be "monetized," resulting in an incremental increase in revenue of $4.6 billion.

51.    The response to Twitter's Analyst Day was very positive, in large part due to management's statements concerning favorable MAU growth and user engagement.  As reported by Advertising Age that day:

> At its inaugural Analyst Day on Wednesday, the social media company unveiled a host of features designed to lure in new people, but also ambitions to measure and make money from people that see Twitter content without signing in. And for the first time, Twitter offered numbers for what it calls "logged out" users: 500 million unique visitors a month.

> Twitter has hinted frequently in recent quarters at its desire to convey and capitalize on its audience beyond its 284 million active registered users. On Wednesday it made that goal more explicit.  "We want Twitter to be nothing less than the very best way to keep up with your world," CEO Dick Costolo said at the start of the event. "We have a goal to build the largest daily audience in the world."

* * *

Twitter also attached metrics to these various levels of reach, some for the first time. Overall, Twitter content achieves 185 billion impressions a month, the company said. Some 200 million unique visitors each month land on Twitter profile pages, primarily those of celebrities and brands, without signing into an account. And another 75 million arrive via search, where the company said it was expanding its product portfolio.

Under these new metrics, Twitter would reach 2 billion monthly active users, at its current growth rate, by 2020, Mr. Noto told investors.

Mr. Noto dropped another ambitious projection: Twitter revenue would hit $14 billion 10 years after this one, when it hit $1 billion in revenue. The company has netted around $1.2 billion in its last four quarters.

52.     Due to the optimistic statements presented by Twitter's management during the Analyst Day, investors and analysts believed that the Company's user metrics were reliable and that user growth and engagement would continue to trend significantly upward. The Analyst Day presentation had the effect of lifting Twitter's stock price by 6% that same day.

53.     Notably, despite defendant Noto's statements highlighting the importance of user engagement as a driver for MAU growth, the Individual Defendants abruptly stopped reporting Timeline Views—the historical measure of user engagement—leading up to and continuing throughout the Relevant Period.

54.     The decision to stop reporting Timeline Views was a major cause for concern for investors and analysts. As highlighted in an April 27, 2015 Wall Street Journal article titled *RIP Twitter's 'Timeline Views' – What Metric Will Replace It*, "the [Timeline Views] metric helped analysts measure the health and future potential of the company. By dividing advertising revenue by timeline views, analysts could track Twitter's ability to make money from user engagement." The Wall Street Journal article noted that if Twitter was no longer reporting Timeline Views, the Company needed a "replacement" metric so that investors and analysts could gauge user engagement and assess the Company's financial health and growth prospects. The article quoted RBC Capital Markets analyst Mark Mahaney, who remarked "[l]ess disclosure is always a bad

-19-

thing especially for something that's important like engagement," and then asked: "What's the new metric?"

55.     As it turned out, Twitter's management did have a new user engagement metric that replaced Timeline Views.  By the beginning of and throughout the Relevant Period, the Individual Defendants were internally tracking an alternative user engagement metric known as DAUs, or Daily Active Users, which measured frequency of use.   The problem, however, was that the Individual Defendants failed to disclose to investors that DAUs was the Company's *primary* user engagement metric, and likewise failed to provide meaningful updates on user engagement trends. And to the extent that Twitter's management ever mentioned or discussed DAUs at all, the metric was presented in different formats to prevent historical comparison and to obscure trends in user engagement.    The Individual Defendants' decision not to provide meaningful information concerning user engagement metrics, particularly DAUs, was deliberate and intended to mask adverse trends in Twitter's user growth and user engagement.

**The Individual Defendants Disseminated and/or Caused the Company to Disseminate False and Misleading Statements During the Relevant Period**

56.     On February 5, 2015, the start of the Relevant Period, the Individual Defendants caused and/or permitted Twitter to issue a press release and file a current report on Form 8-K with the SEC announcing the Company's financial and operating results for the fourth quarter ("Q4") and fiscal year ended December 31, 2014 ("FY 2014").  For FY 2014, Twitter reported non-GAAP net income of $101 million, or $0.14 per diluted share, on revenue of $1.4 billion, compared to non-GAAP net income loss the previous year of $34.3 million, or –$0.18 per diluted share, on revenue of $664.9 million.  The press release stated in relevant part:

*"We closed out the year with our business advancing at a great pace.*[1]  Revenue growth accelerated again for the full year, and we had record quarterly profits on an adjusted EBITDA basis," said Dick Costolo, CEO of Twitter.  *"In addition, the trend thus far in Q1 leads us to believe that the absolute number of net users added in Q1 will be similar to what we saw during the first three quarters of 2014*."

\*   \*   \*

**Fourth Quarter 2014 Operational Highlights**

Average Monthly Active Users (MAUs) were 288 million for the fourth quarter, an increase of 20% year-over-year, which reflects a loss of approximately 4 million net Monthly Active Users in the fourth quarter due to changes in third party integrations.

Average Mobile MAUs represented approximately 80% of total MAUs.

Timeline views reached 182 billion for the fourth quarter of 2014, an increase of 23% year-over-year.

Advertising revenue per thousand timeline views reached $2.37 in the fourth quarter of 2014, an increase of 60% year-over-year.

\*   \*   \*

**Fourth Quarter 2014 Financial Highlights**

**Revenue** – Revenue for the fourth quarter of 2014 totaled $479 million, an increase of 97% compared to $243 million in the same period in 2013.

57.     That same day, the Company hosted a conference call with analysts and investors during which defendants Costolo and Noto repeated and discussed the Q4 and FY 2014 financial results.  And, for the first time as a public company, Twitter did not disclose meaningful and reliable user engagement metrics as part of its earnings announcement.  During the February 5, 2015 conference call, defendant Noto noted that the Company was no longer reporting Timeline Views, which historically had been one of the primary measures of user engagement.  Instead, Noto explained there "are a number of different ways that we measure [user] engagement."

---

[1] Emphasis added unless otherwise noted throughout.  The statements made or authorized by the Individual Defendants that ***are bolded and italicized*** are the statements alleged to be false and misleading.  Additional statements are **bolded** (and not italicized) for emphasis.

In terms of engagement metrics, as I mentioned, we're no longer going to provide the metric of timeline view. And the reason for that is it's really a measurement that doesn't reflect the initiatives that we're doing. In fact, if anything, we're taking specific initiatives and product changes that will hurt timeline view.

\* \* \*

And so that's why we decided to eliminate the timeline view metric, given that we have specific product changes that will hurt that metric. ***More broadly, as we think about engagement, there are a number of different ways that we measure engagement – there's no one perfect way.*** When it comes to advertising, it's going to be click-through rate. And it's actually different by each format. A mobile app download click-through rate is very different than a regular Promoted Tweet that could be either re-tweeted or favorited as a measurement of payment.

***And so as we get to a point where we have a metric that's going to really reflect what we're trying to do, we'll share that with you. But, at this point, there's a number of them that we look at, and no one metric to share.***

58.     Despite the announcement that the Company was no longer reporting Timeline Views, the Individual Defendants did not disclose that Twitter's management was now focused on internally monitoring DAUs, which had become the Company's de facto measure of user engagement. By claiming that management looked at a "number" of metrics, defendant Noto sought to conceal the importance of DAUs as Twitter's primary user engagement metric.

59.     Also, during the February 5, 2015 conference call, defendant Costolo attempted to downplay the declining monthly active user growth, suggesting it was a one-time event limited to Q4 2014. Costolo blamed the stagnation on "quarter-specific factors that impacted [Twitter's] net adds in Q4, which include seasonality and a couple of issues related to the launch of [the iPhone's newest software update]." And, when questioned about potential acceleration of monthly active user growth, Costolo asserted that the Company's new product initiatives would drive growth and bring it back to the same levels experienced in the first three quarters of 2014:

[Analyst]:  On the MAU number ... I'm curious as to the acceleration [in MAU growth] there, if that's seasonality or something else?

[Defendant Costolo]: Sure. Thanks, Paul, this is Dick. In Q1, I would say it's a combination of seasonality, a return to organic growth, ***and the set of product initiatives we've created to drive growth***. Again, at a high level, I'd like to say that

I'm thinking about growth and our product as, these changes we're making now as helping us grow across logged-in, logged-out, and our syndicated audience across the web and third-party mobile apps.

The user numbers we saw on January, again, indicate that ***our MAU trend has already turned around, and that Q1 trend is likely to be back in the range of absolute net ads that we saw during the first three quarters of 2014.*** So we're in a great place there. ***And, again, I would stress that it's seasonality, a return to organic growth, and product initiatives, all taken together.***

60.     The statements issued on February 5, 2015, were false and misleading when made because the Individual Defendants concealed material adverse facts that they knew and deliberately disregarded, including that: (a) by early 2015, DAUs was the primary user engagement metric that was being tracked internally by Twitter management; (b) Twitter was facing adverse user trends, including flattening and declining user growth and user engagement; (c) the highly-touted product initiatives were not actually having a meaningful impact on MAU growth; (d) the purported acceleration or increase in user growth was in fact due to low quality MAU growth, whereby new users were not as engaged as pre-existing users and therefore would not contribute to meaningful, long-term MAU growth; and (e) the low-quality MAU growth would have been apparent if Individual Defendants disclosed reliable user engagement data.

61.     The market responded favorably to the foregoing false and misleading statements, as Twitter's stock price rose nearly 17% in one day to close at $48.01 per share on February 6, 2015, on volume of 102 million shares.

62.     On March 2, 2015, the Individual Defendants caused the Company to file an Annual Report on Form 10-K with the SEC, for fiscal year ended December 31, 2014 (the "2014 10-K").   The 2014 10-K, signed by defendants Costolo, Noto, Dorsey, Fenton, Rosenblatt, Scardino, and Williams, described the "Key Metrics" used by Twitter to evaluate its business, growth, and performance.   Notably, the Key Metrics section included a discussion about MAUs, but not about DAUs:

**Key Metrics**

We review a number of metrics, including the following key metrics, to evaluate our business, measure our performance, identify trends affecting our business, formulate business plans and make strategic decisions.

*Monthly Active Users (MAUs).* We define MAUs as Twitter users who logged in or were otherwise authenticated and accessed Twitter through our website, mobile website, desktop or mobile applications, SMS or registered third-party applications or websites in the 30-day period ending on the date of measurement. Average MAUs for a period represent the average of the MAUs at the end of each month during the period. MAUs are a measure of the size of our active user base. In the three months ended December 31, 2014, we had 288 million average MAUs, which represents an increase of 20% from the three months ended December 31, 2013. The growth in average MAUs was driven primarily by organic growth and growth initiatives. In the three months ended December 31, 2014, we had 63 million average MAUs in the United States and 225 million average MAUs in the rest of the world, which represent increases of 17% and 21%, respectively, from the three months ended December 31, 2013. For additional information on how we calculate MAUs and factors that can affect this metric, see the section titled "Note Regarding Key Metrics."



**Monthly Active Users: Worldwide**
(quarterly average in millions)

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Dec 31 2012 | Mar 31 2013 | Jun 30 2013 | Sept 30 2013 | Dec 31 2013 | Mar 31 2014 | Jun 30 2014 | Sep 30 2014 | Dec 31 2014 |
| 185 | 204 | 218 | 232 | 241 | 255 | 271 | 284 | 288 |

63.     The 2014 10-K also reiterated that the Company was no longer reporting Timeline

Views, yet provided no alternate measure for user engagement (such as DAU):

*Timeline Views, Timeline Views Per MAU and Advertising Revenue Per Timeline View.* We define timeline views as the total number of timelines requested and delivered when registered users visit Twitter, refresh a home timeline (but not other timelines) or view search results while such user is logged in or is otherwise authenticated on our website, mobile website or desktop or mobile applications (excluding our TweetDeck and Mac clients, as we do not fully track this data). We believe that timeline views going forward will not be a helpful metric for measuring user engagement because the ongoing optimization of our products has reduced the number of times a user needs to request a timeline view, which has resulted in timeline views becoming an unrepresentative measure of user engagement with our platform.  We do not intend to report timeline views metric in future filings but we present it here for historical purposes. Timeline views per MAU are calculated by dividing the total timeline views for the period by the average MAUs for the last three months of such period. In the three months and year ended December 31, 2014, we had 182.0 billion and 692.5 billion timeline views, respectively, which represent increases of 23% and 17% from the three months and year ended December 31, 2013, respectively. In the three months and year ended December 31, 2014, we had 49.2 billion and 191.1 billion timeline views in the United States, respectively, which represent increases of 20% and 16% from the three months and year ended December 31, 2013, respectively. In the three months and year ended December 31, 2014, we had 132.8 billion and 501.3 billion timeline views in the rest of the world, respectively, which each represent an increase of 24% and 17% from the three months and year ended December 31, 2013, respectively. In the three

months ended December 31, 2014, we had 631 timeline views per MAU, which represents an increase of 3% from the three months ended December 31, 2013. In the three months ended December 31, 2014, we had 778 timeline views per MAU in the United States and 590 timeline views per MAU in the rest of the world, which represent increases of 3% from the three months ended December 31, 2013. For additional information on how we calculate the number of timeline views and factors that can affect this metric, see the section titled "Note Regarding Key Metrics."

64.     In the section of the 2014 Form 10-K entitled "NOTE REGARDING KEY METRICS," the Individual Defendants again emphasized that Timeline Views was no longer an important metric, but again failed to provide any alternative user engagement metric:

We present and discuss timeline views in this Annual Report on Form 10-K. We have estimated a small percentage of timeline views in the three months ended September 30, 2013 to account for certain timeline views that were logged incorrectly during the quarter as a result of a product update. We believe this estimate to be reasonable, but the actual numbers could differ from our estimate. Additionally, the ongoing optimization of our products has reduced the number of times a user needs to request a timeline view. As a result, our management team believes timeline views have become an unrepresentative measure of, and will not use them internally to measure for, user engagement on our platform. As we announced on November 12, 2014, we do not intend to disclose timeline views for any future period. They are presented here only for historical purposes.

65.     The 2014 Form 10-K filing included certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX"), signed by defendants Costolo and Noto, each certifying that:

1.     I have reviewed this Annual Report on Form 10-K of Twitter, Inc.;

**2.     Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;**

**3.     Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;**

4.     The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a–15(e) and 15d–15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a–15(f) and 15d–15(f)) for the registrant and have:

(a)     Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to

ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

(b)      Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

(c)      Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

(d)      Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and;

5.      The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

*(a)      All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and*

*(b)      Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.*

66.      The statements in the 2014 Form 10-K were false and misleading when made because the Individual Defendants concealed material adverse facts that they knew and deliberately disregarded, including that: (a) by early 2015, DAUs was the primary user engagement metric that was being tracked internally by Twitter management; (b) Twitter was facing adverse user trends, including flattening or declining user growth and user engagement; (c) the highly-touted product initiatives were not actually having a meaningful impact on MAUs; (d) the purported acceleration or increase in user growth was in fact due to low quality MAU growth, whereby new users were not as engaged as pre-existing users and therefore would not

contribute to meaningful, long-term MAU growth; and (e) the low-quality MAU growth would have been apparent if Individual Defendants disclosed reliable user engagement data.

67.     Not long after the filing of the 2014 10-K, on April 13, 2015, the SEC sent a letter to defendant Costolo, in his capacity as Twitter's CEO and director, requesting additional information from the Company on the statements in the 10-K concerning Timeline Views. In the letter, the SEC reminded Twitter of its obligation to disclose user engagement information and requested that the Company provide "alternative metrics" to explain trends in user engagement. Importantly, the letter referred Twitter's management to SEC Release 33-8350, a Management Discussion and Analysis ("MD&A") disclosure rule requiring the disclosure of key internal metrics used by management.[2] The SEC letter states in relevant part:

> We note your disclosures relating to Timeline Views, Timeline Views per Monthly Active User (MAU), and Advertising Revenue Per Timeline. We also note on page 46 that going forward you intend to cease presenting timeline views in future filings. Please address the following:
>
> ☐ **Please describe the alternative metric(s) you anticipate presenting in future filings to explain trends in user engagement** and advertising services revenue. Also, please describe your reasons for choosing such metric(s).
>
> *   *   *
>
> **We refer you to Section III.B of SEC Release 33-8350.**



---

[2] SEC Release 33-8350 states in relevant part: "[O]ne of the principal objectives of MD&A is to give readers a view of the company through the eyes of management ... companies should 'identify and address those key variables and other qualitative and quantitative factors which are peculiar to and necessary for an understanding and evaluation of the individual company.'"

69. The letter by the SEC highlights the Individual Defendants' failure to report DAU (or any other meaningful user engagement metric for that matter), and that the lack of disclosure was a material omission that violated SEC disclosure rules. Despite the pressing nature of the SEC's inquiry, Twitter's senior management waited nearly a month to respond.

70. On April 20, 2015, the Individual Defendants caused Twitter to file the Proxy in connection with the 2015 Annual Stockholders meeting held on June 3, 2015, pursuant to section 14(a) of the Exchange Act. In the Proxy, the Individual Defendants solicited stockholder votes to, among other things, re-elect two Board members, including defendants Rosenblatt and Williams. The Proxy described director responsibilities, the duties of each committee, Board risk management, and provided information about the director nominees up for re-election. However, the Proxy contained materially misleading statements with respect to the solicited votes.

71. The Proxy stated the following in support of re-electing defendants Rosenblatt and Williams:

**Board Leadership Structure and Role of our Lead Independent Director**

We believe that the structure of our board of directors and its committees provides *strong overall management of our company*. Our Chairman of our board of directors and our Chief Executive Officer roles are separate and our independent directors have appointed a Lead Independent Director. This structure enables each person to focus on different aspects of company leadership. Our Chief Executive officer is responsible for setting the strategic direction of our company, the general management and operation of the business and the guidance and oversight of senior management. *The Chairman of our board of directors monitors the content, quality and timeliness of information sent to our board of directors and is available for consultation with our board of directors regarding the oversight of our business affairs*.

\*   \*   \*

*Audit Committee*

Our audit committee consists of Messrs. Currie and Fenton and Ms. Scardino, with Mr. Currie serving as Chairman. Each of our audit committee members meets the requirements for independence for Audit Committee members under the listing standards of the New York Stock Exchange and SEC rules and regulations. Each member of our audit committee also meets the financial literacy and sophistication requirements of the listing standards of the New York Stock Exchange. In addition, our board of directors has determined that Mr. Currie is an audit committee financial expert within the meaning of Item 407(d) of Regulation S-K under the Securities Act of 1933, as amended. Among other responsibilities, our audit committee ... *reviews, with management and the independent registered public accounting firm, our interim and year-end operating results*[.]

\* \* \*

### Nominating and Corporate Governance Committee

Our nominating and corporate governance committee consists of Messrs. Chernin, Currie and Rosenblatt, with Mr. Currie serving as Chairman, each of our nominating and corporate governance committee members meets the requirements for independence under the listing standards of the New York Stock Exchange and SEC rules and regulations. Mr. Chernin will serve as Chairman of our nominating and corporate governance committee beginning on May 1, 2015. Among other responsibilities, our nominating and corporate governance committee:

- identifies, evaluates and selects, or makes recommendations to our board of directors regarding, nominees for election to our board of directors and its committees;

- *evaluates the performance of our board of directors and of individual directors*;

- considers and makes recommendations to our board of directors regarding the composition of our board of directors and its committees;

- reviews developments in corporate governance practices;

- *evaluates the adequacy of our corporate governance practices and reporting*; and

- develops and makes recommendations to our board of directors regarding corporate governance guidelines and matters.

\* \* \*

### Risk Management

Risk is inherent with every business, and we face a number of risks, including strategic, financial, business and operational, legal and compliance, and reputational. We have designed and implemented processes to manage risk in our operations. Management is responsible for the day-to-day management of risks the company faces, while our board of directors, as a whole and assisted by its committees, has responsibility for the oversight of risk management. *In its risk oversight role, our board of directors has the responsibility to satisfy itself that the risk management processes designed and implemented by management are appropriate and functioning as designed*.

*   *   *

While our board of directors is ultimately responsible for risk oversight, our board committees assist our board of directors in fulfilling its oversight responsibilities in certain areas of risk. ***Our audit committee assists our board of directors in fulfilling its oversight responsibilities with respect to risk management in the areas of internal control over financial reporting and disclosure controls and procedures***, legal and regulatory compliance, and discusses with management and the independent auditor guidelines and policies with respect to risk assessment and risk management. Our audit committee also reviews our major financial risk exposures and the steps management has taken to monitor and control these exposures. ***Our audit committee also monitors certain key risks on a regular basis throughout the fiscal year, such as risk associated with internal control over financial reporting*** and liquidity risk.

72.      The Individual Defendants' statements in the Proxy misleadingly suggested that: (i) the Board was effective in overseeing Twitter's business affairs; (ii) the Audit Committee was effective in fulfilling its oversight responsibilities with respect to internal control over financial reporting and disclosure controls and procedures; and (iii) the Nominating and Corporate Governance Committee, including defendant Rosenblatt, effectively evaluated the performance of the Board and the adequacy of Twitter's corporate governance practices and reporting. In addition, the Proxy omitted any disclosures reflecting or acknowledging that: (i) by early 2015, the Individual Defendants were regularly providing misleading disclosures concerning the critical metrics of user engagement and user growth, both of which were flat or declining; and (ii) the Individual Defendants were failing to disclose any adequate metrics to guide the public with respect to user engagement.

73.      The Proxy harmed Twitter by interfering with the proper governance on its behalf that follows the free and informed exercise of the stockholders' right to vote for directors. As a result of the Individual Defendants' misleading statements in the Proxy, Twitter's stockholders voted to re-elect defendants Williams and Rosenblatt.

74.      On April 28, 2015, the Individual Defendants caused and/or permitted Twitter to issue a press release and file a current report on Form 8-K with the SEC announcing the Company's

financial and operating results for the first quarter of 2015 ended March 31, 2015 ("Q1 2015").

For Q1 2015, Twitter reported non-GAAP net income of $47 million, or $0.07 per diluted share,

on revenue of $436 million. Twitter also reported that MAUs increased only 5% in the quarter,

including 3% growth in U.S. MAUs, and lowered the Company's full year revenue forecast to

between $2.17 billion and $2.27 billion, from prior guidance of $2.3 billion to $2.35 billion. The

press release stated in part:

> Twitter's first quarter revenues were affected by a lower-than-expected contribution
> from its newer direct response products. The Company expects this revenue impact
> to continue for the remainder of the fiscal year as outlined in the outlook section
> below.
>
> "While we exceeded our EBITDA target for the first quarter, revenue growth fell
> slightly short of our expectations due to lower-than-expected contribution from
> some of our newer direct response products," said Dick Costolo, CEO of
> Twitter. "It is still early days for these products, and we have a strong pipeline that
> we believe will drive increased value for direct response advertisers in the
> future. We remain confident in our strategy and in Twitter's long-term opportunity,
> and our focus remains on creating sustainable shareholder value by executing
> against our three priorities: strengthening the core, reducing barriers to
> consumption and delivering new apps and services."

75.     That same day, Twitter hosted a conference call with analysts and investors, during

which defendants Costolo and Noto repeated and discussed the Q1 2015 financial results. During

the conference call, defendant Noto addressed questions posed by analysts concerning the user

engagement metrics used by the Company and conveyed that Twitter's management were looking

at "a lot of different metrics … internally." Again, this was misleading because Twitter's

management was internally focused on DAUs as the primary user engagement metric. Defendant

Noto also falsely stated that "DAU to MAU ratios in the quarter were similar to what they were

by market relative to Analyst Day." Defendant Noto stated in relevant part:

> [Analyst]:  Thanks for taking the question. I guess, one for Dick and one for
> Anthony. Fully appreciate, I think all of us do that the timeline view metric had
> fully outlived its usefulness and that's great.  Just wondering if you have any
> thoughts on how we should be thinking about monitoring engagement going
> forward? That's first one. And then secondly, with regard to your own analytics and

measurement products, wondering if you could step back and give yourself a self-evaluation, where you think you are in the development curve of analytics on your own platform and what could we expect from a product development cycle going forward this year? Thank you.

[Defendant Noto]: Sure. In terms of engagement metrics, ***there is a lot of different metrics that we look at internally. There is not one metric for engagement***. And so I can give you a sense of some of them and quite frankly, we ***would like to be able to give you more visibility in this***, but there is just a number of different measurement. So DAU is one measurement of engagement. We talked about that at Analyst Day. It's a measurement that is dependent by market and you can have mix shift. So it could be a little bit misleading, ***but DAU to MAU ratios in the quarter were similar to what they were by market relative to Analyst Day.***

Other engagement metrics that we look at are tweets per day, favorites and retweets, direct messages, searches. Our number of searches actually accelerated on year-over-year growth basis in the quarter. Direct messages also accelerated on a year-over-year basis in the quarter. Favorite and retweets had strong growth and we had growth in tweets per day as well. So those metrics all were generally positive.

The timeline view metric, we don't look at internally. It is a metric that we are doing things that actually hurt it and that was one of the reasons why we eliminated it. So we continue to look for metrics that could be helpful to you and we will try to give you color from time to time across these different metrics. ***But there is not one, the all-in metric.***

76.     Following April 28, 2015 press release and conference call, the price of Twitter stock dropped $9.39 per share to close at $42.27 per share that day, a decline of 18%, as result of the partial revelations concerning Twitter's MAU and user engagement issues.  On the following day, April 29, 2015, the price of Twitter stock dropped again, falling $3.78 per share to close at $38.49 per share, a one-day decline of nearly 9% on volume of more than 120 million shares.

77.     However, the positive statements made by Twitter's senior management about active users and new product features kept the price of the stock from dropping further.  In particular, defendants Costolo and Nolo made the following statements during the April 28, 2015 conference call:

[Defendant Costolo]:  I talked last quarter about the experiments we were running to test instant timelines. ***The results during our experiment were quite positive in terms of engagemen***t.

*     *     *

-33-

[Defendant Noto]: *We are very encouraged by the growth we've experienced thus far*, but as often is the case with new products, we have a great deal of iterating and fine-tuning to do as we scale in order to maximize the effectiveness of these products in our complex marketplaces.

78.     The statements made on April 28, 2015, were materially false and misleading when made because the Individual Defendants concealed material adverse facts they knew or deliberately disregarded, including that: (a) by early 2015, DAUs had become the primary user engagement metric that was being tracked internally by Twitter management; (b) Twitter was facing adverse user trends, including flattening or declining user growth and user engagement; (c) the DAUs reported during Q1 2015 was not "similar" to the DAUs at Analyst Day because DAUs at that time were substantially declining; and (d) the highly-touted product initiatives were not effective at increasing user engagement or MAU growth.

79.     On May 11, 2015, the Individual Defendants caused Twitter to file a quarterly report on Form 10-Q with the SEC, reiterating the financial and operating results stated in the press release for the first quarter of fiscal year 2015 (the "Q1 2015 10-Q").  The Q1 2015 10-Q included the following statements:

**Key Metrics**

We review a number of metrics, including the following key metrics, to evaluate our business, measure our performance, identify trends affecting our business, formulate business plans and make strategic decisions:

*Monthly Active Users (MAUs).* We define MAUs as Twitter users who logged in or were otherwise authenticated and accessed Twitter through our website, mobile website, desktop or mobile applications, SMS or registered third-party applications or websites in the 30-day period ending on the date of measurement. Average MAUs for a period represent the average of the MAUs at the end of each month during the period. MAUs are a measure of the size of our active user base. In the three months ended March 31, 2015, we had 302 million average MAUs, which represents an increase of 18% from the three months ended March 31, 2014. The growth in average MAUs was driven primarily by organic growth and growth initiatives. In the three months ended March 31, 2015, we had 65 million average MAUs in the United States and 236 million average MAUs in the rest of the world, which represent increases of 15% and 19%, respectively, from the three months ended March 31, 2014.



**Monthly Active Users: Worldwide**
(quarterly average in millions)

Given our prioritization of growth in emerging markets, we are delivering a more complete product experience to SMS Fast Followers, which are users who sign-up and access Twitter solely via SMS, and will be including SMS Fast Followers as part of our total MAU count going forward. MAUs including SMS Fast Followers would have been 258 million, 274 million, 287 million, 292 million, and 308 million average MAUs in the three month periods ending March 31, 2014, June 30, 2014, September 30, 2014, December 31, 2014, and March 31, 2015, respectively. MAUs including SMS Fast Followers in the United States would have been 57 million, 60 million, 64 million, 64 million, and 66 million average MAUs in the three months ending periods ending March 31, 2014, June 30, 2014, September 30, 2014, December 31, 2014, and March 31, 2015, respectively. MAUs including SMS Fast Followers in the rest of the world would have been 201 million, 214 million, 224 million, 229 million, and 242 million average MAUs in the three months ending periods ending March 31, 2014, June 30, 2014, September 30, 2014, December 31, 2014, and March 31, 2015, respectively.

80.    The Q1 2015 Form 10-Q contained signed certifications pursuant to SOX by defendants Costolo and Noto similar to the certifications described in paragraph 76.

81.    The statements in the Q1 2015 10-Q were materially false and misleading when made because the Individual Defendants concealed adverse facts they knew or deliberately disregarded, including that: (a) by early 2015, DAUs was the primary user engagement metric that

was being tracked internally by Twitter management; (b) Twitter was facing adverse user trends, including flattening or declining user growth and user engagement; (c) the highly-touted product initiatives were not actually having a meaningful impact on MAUs; (d) purported acceleration or increase in user growth was in fact due to low quality MAU growth, whereby new users were not as engaged as pre-existing users and therefore would not contribute to meaningful, long-term MAU growth; and (e) the low-quality MAU growth would have been apparent if Individual Defendants disclosed reliable user engagement data.

82.     On May 11, 2015, the Individual Defendants finally caused Twitter to respond to the SEC's April 11, 2015 inquiry, with a letter that explained, among other things, that the Company's management was using alternative metrics to internally track user engagement:

> *The Company respectfully advises the Staff that it has included two metrics, changes in ad engagements and changes in cost per ad engagement, on page 25 in the Key Metrics section of its Quarterly Report on Form 10-Q for the quarter ended March 31, 2015, filed on May 11, 2015* (the "Form 10-Q"). *These metrics are intended to serve as a measure of user engagement and demand, respectively, on the Company's platform.* Ad engagements measure user interactions with the Company's Promoted Products and include expanding, retweeting, favoriting or replying to a Promoted Tweet, playing an embedded video, downloading a promoted mobile application or opting in to further communications from an advertiser in a Promoted Tweet, following the account that tweets a Promoted Tweet or following a Promoted Account. Therefore, changes in ad engagements indicate trends in user engagement and, in particular, user engagement with ads, which affects revenue. Changes in cost per ad engagements reflect the changes in the average cost per ad engagement in the period discussed.
>
> *The Company's management internally tracks changes in ad engagements and cost per ad engagement on the Twitter platform to monitor trends in user engagement and advertising services revenue and believes these metrics are helpful to investors to understand the same. The Company uses changes in ad engagements and cost per ad engagements to assess drivers for monetization on its platform in its Management's Discussion and Analysis of Financial Condition and Results of Operations ("MD&A"). In addition, the Company believes the metrics may be a helpful comparison of the Company's performance against other companies in its market, which also report changes in engagements with advertisements on their platforms.*
>
> The Company notes that while it provides a qualitative discussion of the changes to its advertiser base for additional context about growth in revenue, the Company does not manage its business based on the number of advertisers or revenue per

advertiser. Therefore, the Company does not believe disclosing the number of advertisers or revenue per advertiser would be material to investors' understanding of the Company's advertising services revenue. While having more advertisers bidding on the Company's Promoted Products can result in increased revenue, disclosing the number of advertisers on the platform is not necessarily indicative of the health of the Company's advertising services revenue. For example, the Company could gain one large brand advertiser in a period that spends significantly more than all of the new small business advertisers in that same period. In addition, specifically quantifying advertisers for purposes of regular quarterly disclosures would require the Company to undertake new procedures and define counting conventions, which it does not currently do, relating to multiple advertisers working through the same advertising agency and multiple advertising brands that are part of one legal entity or group; providing specific and reliable information regarding the number of advertisers in a timely way at the Company's scale is not practical.

83. The statements in the May 11, 2015 letter sent to the SEC were false and misleading when made because the ad engagement metric, which the Individual Defendants represented would be "helpful to investors to understand" and would "monitor trends in user engagement," was a monetization metric, rather than a user engagement metric. The trend in "ad engagements" was not indicative of trends in user engagement. In fact, the trend in "ad engagements" was moving in the opposite direction (i.e., increasing) from the trend in user engagement. Furthermore, the statements in the May 11, 2015 letter to the SEC were false and misleading when made because: (a) by early 2015, DAUs was the primary user engagement metric that was being tracked internally by Twitter management; and (b) Twitter was facing adverse user trends, including flattening or declining user growth and user engagement.

84. On June 11, 2015, the Company issued a press release and filed a current report on Form 8-K with the SEC announcing that defendant Costolo had "decided to step down as CEO of Twitter, effective July 1, 2015," and that the Board had named defendant Dorsey as interim CEO.[3]

---

[3] Defendant Dorsey later became Twitter's permanent CEO and continues to hold the position to this day.

The ouster of defendant Costolo makes clear that the Individual Defendants were well aware of the negative DAU and DAU/MAU trends at the Company—which had not been disclosed to stockholders or the investing public—and yet failed to hold defendant Costolo accountable or reveal the truth to the public for another month-and-a-half.

85. On June 12, 2015, an article in *Fortune* titled "Where Did Dick Costolo Go Wrong?" described defendant Costolo's failures, including his efforts to "shift the narrative on user growth," as follows:

> Costolo failed at doing the things that protect a stock price, too. Twitter doubled its revenues every year it was a public company, which is an impressive feat. But it never turned a profit, which is what investors demanded.

> Worse, Twitter lost its magic ability to lure in new users—the very thing that propelled it through its rocky early years. Costolo even tried to shift the narrative on user growth, pointing to the number of people who see Tweets embedded around the Web (500 million) instead of how many people actually use Twitter (just under 300 million). The company announced plans to begin monetizing those "logged-out" users.

> Investors didn't buy the strategy. It's not clear even Costolo bought it. Before his resignation this week, Costolo offered to resign last November, and again in February, he said on a media call Thursday. The third time, the Board agreed.

86. On July 28, 2015, Twitter's stock closed at $36.54 per share.

87. As a result of the Individual Defendants' false and misleading statements and omissions, Twitter shares traded at artificially inflated prices during the Relevant Period.

**THE TRUTH EMERGES**

88. On July 28, 2015, Twitter issued a press release announcing the Company's second quarter 2015 financial results ("Q2 2015"), revealing that Twitter's MAUs had increased by only 2 million users over the prior quarter, representing slight growth of less than 1%. The press release included the following statements:

> "Our Q2 results show good progress in monetization, but we are not satisfied with our growth in audience," said Jack Dorsey, interim CEO of Twitter. "In order to realize Twitter's full potential, we must improve in three key areas: ensure more

disciplined execution, simplify our service to deliver Twitter's value faster, and better communicate that value."

\* \* \*

Monthly Active Users – Average Monthly Active Users (MAUs) were 316 million for the second quarter, up 15% year-over-year, and compared to 308 million in the previous quarter. The vast majority of MAUs added in the quarter on a sequential basis came from SMS Fast Followers. Excluding SMS Fast Followers, **MAUs were 304 million for the second quarter, up 12% year-over-year, and compared to 302 million in the previous quarter.** Mobile MAUs represented approximately 80% of total MAUs.

89.     After issuing the press release, the Individual Defendants caused the Company to

hold a conference call, during which defendant Noto explained that the Company was experiencing

"very low" user growth and would continue to experience low use growth in the foreseeable future.

Defendant Dorsey, who had just been appointed Twitter's interim CEO, also revealed that the

Company's highly-touted product initiatives were not having a "meaningful impact" on user

growth.  The conference call included the following statements:

[Defendant Noto]:  **[I]n the near term, our organic growth is going to be very low, as it was this quarter** and as I think about Q3, it's marginally better.  But I wouldn't want you to or anyone else to expect change in our growth rate relative to what you're seeing this quarter.  **I think you'll see that for a while,** and that was my point.

\* \* \*

[Defendant Dorsey]:     **[P]roduct initiatives we've mentioned in previous earnings calls**, like instant timelines and logged out experiences, **have not yet had meaningful impact on growing our audience or participation**. This is unacceptable.

\* \* \*

[Defendant Noto]:  Now, turning to our audience. As I noted throughout the quarter, MAUs in Q2 did not benefit from the same factors that benefited Q1. **Specifically, we did not see organic growth, positive seasonality, or growth initiatives seen in Q1**. We reached 304 million MAUs in Q2 excluding SMS Fast Followers, compared to 302 million MAUs in Q1, for a growth rate of 12% on a year over year basis.

\* \* \*

We are working as rapidly as possible to be in a position to launch an integrated marketing strategy and campaign before the end of 2015. We have also begun the

process of hiring a CMO and are encouraged by the quality of candidates that we're in dialogue with today.

**To be clear, however, we do not expect to see sustained meaningful growth in MAUs until we start to reach the mass market. We expect that will take a considerable period of time**. What I can tell you today, though, is we will be bolder, move faster, and raise the bar in everything we do to unlock value for shareholders by ensuring disciplined execution.

Now, before moving on to our outlook, I wanted to provide an update on some key data points as it relates to the long term opportunities we discussed at our analyst day.

- First, DAU/MAU for our top 20 markets in Q2 2015 was approximately 44%, vs the 48% we shared with you at our Analyst Day which is for the first three quarters of 2014.

- Second, Ad load, as measured by total ad impressions divided by total tweet impressions, is approximately one third of what we see as the long term potential.

- Third, since going public, our revenue growth has primarily been driven by increased users and increased monetization via increased load factor. During this period, supply has been greater than demand. However, over time we recognize that if we do not grow audience, drive increased engagement, or begin to monetize other areas such as logged out, it is possible that on some days our revenue could be impacted by limited available inventory for specific ad types.

90.     The market responded negatively to this news, resulting in a substantial sell-off of

Twitter stock.  The Company's stock price declined nearly 15% in one day, falling $5.30 per share

to close at $31.24 on July 29, 2015, and erasing over $3.5 billion in market capitalization.

Commentators, including securities analysts, linked this decline to investors' concern about

adverse trends in user engagement and MAU growth.

91.     Twitter's stock price continued to fall on high trading volumes in the days following

defendants' July 28, 2015 announcement as the market absorbed the news, dropping another 13%

to $27.04 by August 7, 2015.

92.     In September 2016, multiple media sources reported on the possible sale of Twitter,

with potential interest from major companies including Google, Disney, and Apple.  However, on

October 5, 2016, the tech journalism site *Recode* reported that the foregoing companies had

declined to move forward with an acquisition of Twitter. As explained by an analyst from Oppenheimer Holdings Inc., in an article posted on the *Silicon Valley Business Journal* website on October 6, 2016, Twitter presented a "poor acquisition target" due to problems including dismal user growth and poor product implementation, among other things:

> Apple will reportedly not make a bid on Twitter.
>
> Google was seen as one of the most likely the buyers of the social media site, but sources close to the deal said the Mountain View-based company is no longer interested, according to Recode. Twitter stock was down more than 9 percent on the news in after-hours trading.
>
> Several other sources told Recode that Apple was also unlikely to make a bid. One source noted that Twitter should maintain "low expectations" of an offer from a major tech company. Disney also will not make a bid on Twitter after consideration, according to a separate Recode report.
>
> \* \* \*
>
> Twitter recently told potential buyers it plans to conclude negotiations on selling the company by its third-quarter earnings report on Oct. 27, people familiar with the matter told Reuters.
>
> Twitter has more than 313 million monthly active users, **but investors and analysts are skeptical the platform could bring much value to a bidder**. Oppenheimer Holdings Inc., analyst Jason Helfstein wrote in a note to investors last week that **Twitter would make a poor acquisition target "based on slowing user growth, poor product implementation/execution, decreasing user engagement, inferior advertising technology, platform safety issues, and strong competition**."

93.     Also during the summer of 2016, Vanity Fair published a revealing article on Twitter, the changes in management, and the problems the Company was experiencing, entitled *Twitter Is Betting Everything on Jack Dorsey. Will It Work?* (June 1, 2016). The author of the article was Nick Bilton, who had previously written a book about Twitter and had numerous contacts with senior management inside the Company, including the co-founder and current CEO, defendant Dorsey. The Vanity Fair article contained credible witness accounts and information provided by Twitter employees, which confirmed that the Company's senior management had concealed the Company's stagnant growth from investors during the Relevant Period. The article

recounts the meetings defendant Dorsey had with his executive team after being appointed as interim CEO, and the strong message he received from one executive to "come clean" about the Company's stagnant growth numbers.

> One of the first meetings Dorsey organized regarded what he, as interim C.E.O., was going to say to investors at Twitter's upcoming quarterly-earnings call, which was just a few weeks away. This would require some delicate choreography. Dorsey couldn't exactly criticize everything Costolo had done. Since 2010, after all, Dorsey, as a board member, had technically overseen Costolo's performance.

> This conundrum led to a tempestuous discussion among members of the Staff. "We have zero credibility with Wall Street right now," Gabriel Stricker, the director of communications, said in a meeting with Dorsey and top managers. **"We have to come clean" about the company's stagnant growth numbers**.

> **Anthony Noto, the chief financial officer, agreed,** but he had another solution. He wanted to blame the current state of the company on marketing and messaging, essentially throwing Stricker under the bus. When Stricker threatened to quit over the verdict, he was fired.

94.    The Vanity Fair article also reveals, based on sources close to the Company, that Twitter's management had, in fact, falsified the MAU metric and concealed adverse trends concerning the metric:

> I have been told by people close to the company that, in the face of mounting pressure from Wall Street, Twitter occasionally resorted to what most start-ups do when they need to goose the numbers: **they kind of faked it**. This happens at virtually all social networks; the company sends an e-mail to inactive users who haven't been on the service in a few months, informing them there is a problem with their username or account, which leads people to log in to fix the situation. **Magically, those people become monthly active users even if they were not**.

95.    The Vanity Fair article further reveals that during the first half of 2015, members of Twitter's management, including defendant Costolo, viewed "show and tell" presentations during weekly meetings called "Tea Time," which showed that MAU growth was not only failing to meet publicly disclosed growth projections, but was "almost flat."  After consistently hearing this bad news, rather than address head on and disclose the known issues, Twitter's management decided instead to phase out the Tea Time meetings:

For a while, under Costolo, part of the Tea Time ritual included a show-and-tell to the employees about the current state of the business. A projection on a screen would show an animated bird wing, and the words "We Measure Things" would appear. One notable chart showed the number of people who were logging in to Twitter each month. On the chart there were two important lines: a solid line showed the actual number of people on the platform, and a dotted line depicted the projected number of new users in the future. **That dotted line stretched up past 400 million active users and pointed toward an imaginary half-a-billion number. But each week, as the slides went up in front of the employees at Tea Time, the solid line remained almost flat, stagnating around 300 million users. The gap between reality and hope grew so extreme that this section of Tea Time was quietly phased out**.

96.     Due to the reports of Twitter's ongoing failure to increase user growth and poor product execution, the Company's stock price continued to decline, closing at $19.87 per share on October 6, 2016. The Company's stock price continued on its downward trajectory, closing at $16.73 per share on October 17, 2016.

97.     After months of telling the market that the Company looked at a "number" of alternative user engagement metrics, members of Twitter's management confessed that DAUs were the primary engagement metric tracked internally. On multiple occasions, defendant Noto admitted that DAUs were the Company's most important indicator of user engagement:

- "[I]nvestors are constantly asking us for an update on engagement of our users. And there are a lot of different measurements on Twitter engagement ... **but ultimately the thing that we have found probably is the best encapsulation of engagement is DAU.**" Barclays Global Technology Brokers Conference (Dec. 8, 2015).

- "**The one engagement metric that we look at holistically is daily active users.**" Q4 2015 Earnings Call (Feb. 10, 2016).

- "[A]s it relates to engagement, we have a number of factors that we look at as it relates to engagement. **The one that is probably the most important is daily**

**active users, and it's the one that we continue to focus on....**" Q1 2016 Earnings Call (Apr. 26, 2016).

98.     The bad news for Twitter has continued to roll in early in 2017.  On January 12, 2017, *The Motley Fool* published an article titled *Can Twitter, Inc. Keep Up Its User Growth?*, which painted a bleak picture of Twitter's "anemic" user growth:

> Still, Twitter's recent return to more meaningful user growth isn't exactly the sort of growth that should have investors excited. For comparison, Facebook's monthly active users increased from 1,712 million to 1,788 million between the Q2 and Q3, representing 4.4% sequential growth. In addition, Facebook's third-quarter monthly active user count was up 16% year over year.

> And Twitter's user growth looks even less impressive when the social network is measured up against Facebook's Instagram. The photo-and video-sharing app has seen its monthly active users skyrocket from 500 million to 600 million in just six months.

> The point is, it's good Twitter has returned to user growth. But unless Twitter's user growth can accelerate further, there's still reason for investors to be concerned. With anemic growth like this, Twitter doesn't look like the mass-market social network founder and CEO Jack Dorsey says Twitter is.

99.     On February 9, 2017, Twitter announced its financial results for the fourth quarter of 2016.  Twitter reported its slowest quarterly revenue growth since going public.  The Company stated that its user base increased 4% to 319 million average monthly active users.  Analysts on average had expected 319.6 million monthly active users.   And revenue rose just 1% to $717.2 million, missing analysts' average estimate of $740.1 million.

100.     *Forbes* published an article that same day titled *Twitter Shares Plummet As Revenue Growth Nearly Slows To A Halt*, which stated in relevant part:

> Twitter shares plummeted on Thursday after the company reported fourth-quarter revenue that sharply missed analysts' estimates and revenue growth that slowed to just 1% in the same period.

> Shares fell 11% to $16.67 at 9:40 a.m. EST and had tumbled as much as 11% in pre-market trading.

> Revenue growth fell for the tenth straight quarter. Revenue in the fourth quarter, ending Dec. 31, was $717 million, up 1% from $710 million in the same period a year earlier and missing the $740.1 million expected on average among analysts

polled by Yahoo Finance. In the same period a year earlier, Twitter's revenue growth was 48%. (The full report is available here.)

The San Francisco, Calif.-based company posted a net loss of $167 million, or 23 cents a share, compared with a year-earlier loss of $90 million, or 13 cents a share. Excluding certain expenses, Twitter said it would have earned $119 million, or 16 cents a share, topping forecasts of a profit of 12 cents per share on that basis. Twitter currently monetizes users at about half the rate of Facebook FB +1.44%.

Twitter's tepid user growth didn't buoy the stock. Excluding "SMS fast followers," or users who access Twitter via feature phones, monthly active users increased by 4% year-over-year to 319 million in the fourth quarter, slightly higher than year-over-year growth of 3% in the prior quarter. Over the latest quarter it added 2 million more users, in line with analysts' expectations. The company saw year-over-year user growth, excluding SMS fast-followers, of 3% in the third, second and first quarters of 2016.

The company also forecast weak first-quarter earnings. Twitter said it expects first-quarter earnings before taxes of between $75 million and $95 million, well below the $191.3 million expected by analysts.

Twitter COO Anthony Noto said in a statement on Thursday that revenue growth will continue to "lag audience growth due to the sales cycle" and could be hampered by growing competition for digital advertising dollars. He also warned that revenue growth could decrease as the company de-emphasizes some of its revenue-generating products.

*   *   *

The results weren't the positive signal investors had hoped for after quarters of flatlining user growth and declining growth in monetization per user, metrics that likely dampened talks with potential acquirers like Salesforce.com CRM +1.29%, Walt Disney DIS +0.51% and Google GOOGL +1.73% last year.

*   *   *

Twitter's struggle to attract new users raises questions about the company's ability to make its product simple and appealing to a mass audience. Twitter's user growth stands in stark contrast to other popular Facebook-owned apps such as WhatsApp and Messenger, which both have more than 1 billion monthly active users and Instagram, which has 600 million monthly users. By comparison, Facebook saw year-over-year monthly user growth of 17% in the fourth quarter, despite having about six times as many users.

"Twitter is losing traction fast," forecasting firm eMarketer's principal analyst Debra Williamson said in an email. "It is starting to shed once-promising products, such as Vine, and sell off parts of its business, such as its Fabric app development platform. At the same time, some surveys indicate that Twitter is becoming less integral to advertisers' spending plans."

## REASONS STATEMENTS WERE IMPROPER

101.     The true facts, which were known or recklessly disregarded by the Individual Defendants, but were concealed from the investing public, were as follows:

(a)     the Company's publicly disclosed metrics did not paint an accurate picture of user engagement;

(b)     by early 2015, DAUs was the primary user engagement metric that was being tracked internally by Twitter management;

(c)     Twitter was facing adverse user trends, including flattening or declining user growth and user engagement;

(d)     Twitter's highly-touted new product initiatives were not creating meaningful growth in MAUs or user engagement;

(e)     the Company's reported increase in MAUs was the result of increases in low-quality MAUs, users who were less engaged than existing Twitter users and therefore would not contribute to meaningful MAU growth;

(f)     the Company lacked adequate disclosure controls;

(g)     the Company's highly optimistic financial and business prospects were materially false and misleading; and

(h)     based on the foregoing, the Company's projections were improper at all relevant times.

## TWITTER'S INTERNAL BOOKS AND RECORDS SHOW THAT THE INDIVIDUAL DEFENDANTS KNEW THE STATEMENTS WERE FALSE AND MISLEADING

102.     Internal books and records produced by Twitter to Plaintiffs show that █████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████













109.    In addition, the members of Twitter's Audit Committee during the relevant time period—defendants Currie, Fenton, and Scardino—reviewed and approved quarterly and annual financial statements and earnings press releases and oversaw Twitter's internal controls over financial reporting, pursuant to their duties and responsibilities under the Audit Committee Charter.  The internal corporate books and records produced by Twitter to Plaintiffs make clear that ███████████████████████████████████████████████

█████████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████████

[REDACTED]

## INSIDER SELLING

110.     Not all stockholders were harmed by the Individual Defendants' actions.  Indeed, during the Relevant Period, while in possession of material, adverse, non-public information, certain of the Individual Defendants unloaded their holdings of Twitter stock at bloated prices.  Specifically, the Insider Selling Defendants (defendants Dorsey and Williams) took advantage of the artificially inflated prices to sell their Twitter shares for substantial proceeds.  As detailed below, these Insider Selling Defendants sold *more than $281 million* of personally held common stock.

111.     Defendant Dorsey is Twitter's current CEO and director, and also served as Chairman of the Board during the Relevant Period.  Dorsey was aware of material, non-public information regarding the inaccuracy of the Company's statements in press releases and public filings, as well as those made by other senior executives at Twitter.  While in possession of this information, on February 6, 2015, the first day of the Relevant Period, Dorsey sold at least 75,090 personally held shares of Twitter stock at artificially inflated prices for proceeds of

approximately $3,604,651. Dorsey's stock sales during the Relevant Period were timed to maximize profits from the Company's then artificially inflated stock price. Dorsey's stock sales are particularly glaring because just months prior to the start of the Relevant Period, on April 14, 2014, Twitter filed a Form 8-K with the SEC announcing that Dorsey had no "current plans to sell" his shares in the Company.

112.  Defendant Williams is a co-founder of the Company and currently a member of the Board. During the Relevant Period, Williams was aware of material, non-public information regarding the inaccuracy of the statements made by senior executives at Twitter and the Company's statements in its press releases and public filings. In particular, Twitter's internal books and records show that defendant Williams █████████████████████████████████████ ██████████████████████████████████████████████████ ██████████████████████████████████████████████████ ██████████████████████████████████████████████████ ███████████████████ Nonetheless, while in possession of this information, Williams sold more than 6 million personally held shares of Twitter stock at artificially inflated prices for proceeds of more than $273 million. Prior to the Relevant Period, defendant Williams' trading activities were much more limited, having previously sold stock for $85 million in proceeds. Defendant Williams' stock sales are particularly glaring because just months prior to the start of the Relevant Period, on April 14, 2014, Twitter filed a Form 8-K with the SEC announcing that defendant Williams had no "current plans to sell" his shares in the Company. Defendant Williams' sales during the Relevant Period were timed to maximize profits from the Company's then artificially inflated stock price, including the following sales:

(a)     On February 18, 2015, defendant Williams sold 618,000 shares at approximately $48 per share, generating personal proceeds of approximately $29,669,632.

(b)     On February 19, 2015, defendant Williams sold 234,000 shares at approximately $48 per share, generating proceeds of approximately $11,244,598.

(c)     On February 25, 2015, defendant Williams sold 234,000 shares at approximately $48.60 per share, generating proceeds of approximately $11,380,256.50.

(d)     On May 29, 2015, defendant Williams sold 359,128 shares at $36.72 per share, generating proceeds of approximately $13,187,862.50.

113.    Alexander Roetter ("Roetter") is not a defendant in this case. Roetter served as Senior Vice President of Engineering from May 2014 to February 4, 2016. During the Relevant Period, Roetter was aware of material, non-public information regarding the inaccuracy of the statements made by other senior executives at Twitter and the Company's statements in press releases and public filings. While in possession of this information, Roetter sold at least 44,050 personally held shares of Twitter stock at artificially inflated prices for proceeds of more than $1.98 million. Roetter's sales were timed to maximize profits from the Company's then artificially inflated stock price.

114.    Kevin Weil ("Weil") is not a defendant in this case. Weil served as Senior Vice President of Product from October 2014 to January 29, 2016. During the Relevant Period, Weil was aware of material, non-public information regarding the inaccuracy of the statements made by other senior executives at Twitter and the Company's statements in press releases and public filings. While in possession of this information, Weil sold at least 54,454 personally held shares of Twitter stock at artificially inflated prices for proceeds of more than $2.29 million. Weil's sales

during the Relevant Period were timed to maximize profits from the Company's then artificially inflated stock price.

115.     The foregoing insider sales, which resulted in total proceeds of more than $291 million, are summarized in the following chart.  These insider sales were executed under highly suspicious circumstances and occurred while the Company's stock price was artificially inflated due to the misrepresentations and omissions alleged herein.

| Insider | Date | Shares | Price | Proceeds |
|---------|------|--------|-------|----------|
| Dorsey | February 6, 2015 | 23,701 | $48.17 | $1,141,558.67 |
| | February 6, 2015 | 12,100 | $46.52 | $562,927.09 |
| | February 6, 2015 | 39,829 | $47.71 | $1,900,165.91 |
| | **TOTAL** | **75,630** | | **$3,604,651.67** |
| Williams | February 18-26, 2015 | 1,319,900 | $47.88-49.88 | $63,882,358.41 |
| | March 5-17, 2015 | 936,000 | $41.62-48.33 | $43,963,936.66 |
| | April 1-24, 2015 | 1,404,000 | $50.22-51.78 | $71,058,866.13 |
| | May 20-29, 2015 | 1,103,128 | $36.37-37.82 | $40,536,342.77 |
| | June 9-23,2015 | 744,000 | $35.57-36.14 | $26,612,814.86 |
| | July 8-22, 2015 | 743,730 | $34.66-36.74 | $26,432,780.39 |
| | **TOTAL** | **6,250,758** | | **$273,177,755.34** |
| Roetter | April 7, 2015 | 22,923 | $51.27-53.09 | $1,205,374.05 |
| | May 6-18, 2015 | 7,527 | $37.21-37.69 | $280,239.98 |
| | June 5, 2015 | 6,587 | $37.00 | $243,706.48 |
| | July 7,2015 | 7,013 | $35.50 | $248,956.59 |
| | **TOTAL** | **44,050** | | **$1,978,277.10** |
| Weil | February 18, 2015 | 5,169 | $48.03-48.64 | $248,440.33 |
| | March 4-18, 2015 | 8,943 | $46.49-47.08 | $417,809.71 |
| | April 1-29, 2015 | 14,328 | $39.35-51.33 | $689,695.54 |
| | May 15-29, 2015 | 10,406 | $36.74-37.42 | $385,859.16 |
| | June 15-29, 2015 | 10,406 | $34.74-34.78 | $361,711.52 |
| | July 15, 2015 | 5,202 | $36.03-36.78 | $188,696.09 |
| | **TOTAL** | **54,454** | | **$2,292,212.35** |
| **TOTAL INSIDER SALES** | | | | **$281,052,896.46** |

## THE RELATED SECURITIES CLASS ACTION

116.     On October 16, 2017, the Honorable Jon S. Tigar, U.S. District Court Judge for the Northern District of California, sustained certain of plaintiffs' claims in the Securities Class Action

on defendants' motion to dismiss, even under the heightened pleading requirements of the Private Securities Litigation Reform Act of 1995 and Fed. R. Civ. P. 9(b) not applicable here, including defendants' statements regarding "Twitter's MAU, ad engagement, timeline views, and DAU/MAU ratio." Securities Class Action, ECF No. 514 at 2; *see also* Securities Class Action, ECF No. 113 at 28, 41.

117.    Specifically, Judge Tigar found that plaintiffs plausibly alleged, *inter alia*:

- "***[T]he omission of DAU was misleading***" (*id.* at 26);

- "MAU is unhelpful at best and misleading at worst in the absence of companion DAU data" (*id.* at 25);

- "In the absence of DAU data, investors interpreted Defendants' statements as reassurances that the Company had experienced and would continue to experience positive growth and engagement trends[,]" and "***[t]he omission was therefore misleading***" (*id.* at 26–27);

- "Defendants emphasized the importance of daily use and told investors that user engagement trends were positive. Because Defendants made those factual statements without disclosing adverse DAU trends, and indeed, while refusing to acknowledge the importance of DAU when asked for a measure of user engagement, 'a strong inference arises that [they] knowingly misled the public' [*sic*] what was really happening with user engagement at Twitter in 2015" (*id.* at 38) (alteration in original) (citation omitted); and

- "the core operations doctrine, together with Plaintiff's other allegations [many of which are substantially similar to the claims here], ***create a strong inference of scienter***" with respect to the [omission of critical DAU metrics] (*id.* at 41).

118.     Since Judge Tigar's October 16, 2017 Order sustaining class plaintiffs' claims, Judge Tigar certified a class on July 17, 2018.  *See* Securities Class Action, ECF No. 181.  Judge Tigar has also since denied defendants' motion for summary judgment, leaving for trial four unidentified statements plaintiffs allege were misleading.  *See* Securities Class Action, ECF No. 478.[5]  A case management conference to set deadlines in the case, including a trial date, is currently set for July 8, 2020.  *See* Securities Class Action, ECF No. 513.[6]

## DUTIES OF THE INDIVIDUAL DEFENDANTS

**Fiduciary Duties**

119.     By reason of their positions as officers, directors, and/or fiduciaries of Twitter and because of their ability to control the business and corporate affairs of Twitter, the Individual Defendants owed, and owe, the Company and its stockholders fiduciary obligations of trust, loyalty, good faith, and due care, and were, and are, required to use their utmost ability to control and manage Twitter in a fair, just, honest, and equitable manner.  The Individual Defendants were, and are, required to act in furtherance of the best interests of Twitter and its stockholders so as to benefit all stockholders equally and not in furtherance of their personal interest or benefit.

120.     Each director and officer of the Company owes to Twitter and its stockholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the

---

[5] While the court's summary judgment order is sealed, the court's Order Granting Motion for Clarification; Addendum to Order Regarding Defendants' Motion for Summary Judgement entered on May 18, 2020 makes clear that "four statements that Plaintiffs allege were misleading" survived defendants' motion for summary judgment and will proceed to trial absent a settlement.  *See* Securities Class Action, ECF No. 509 at 1.

[6] The Securities Class Action was previously set for trial on June 22, 2020, before the court vacated the trial date on May 19, 2020.  *See* ECF No. 515.

Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing.

121. In addition, as officers and/or directors of a publicly held company, the Individual Defendants had a duty to promptly disseminate accurate and truthful information with regard to the Company's financial and business prospects so that the market price of the Company's stock would be based on truthful and accurate information.

**Audit Committee Duties**

122. In addition to these duties, the members of the Audit Committee (defendants Currie, Fenton, and Scardino) owed specific duties to Twitter under the Audit Committee's Charter to review and approve quarterly and annual financial statements and earnings press releases, and to ensure that the Company had appropriate and effective internal controls over financial reporting.

123. According to Twitter's Audit Committee Charter, in effect since at least 2013, the purpose of the Audit Committee is to assist the Board in fulfilling its responsibilities for overseeing:

- The Company's accounting and financial reporting processes and internal control over financial reporting, as well as the audit and integrity of the Company's financial statements.

- The qualifications, independence and performance of the Company's registered public accounting firm (the "independent auditor").

- The performance of the Company's internal audit function, as required by applicable rules.

- The Company's compliance with applicable law (including U.S. federal securities laws and other legal and regulatory requirements).

- Risk assessment and risk management.

- Prepare the report of the Audit Committee required by the rules of the SEC.

124. Specifically, according to Twitter's Audit Committee Charter, the Audit Committee's responsibilities include the following:

- **Select and Hire the Independent Auditor**. The Audit Committee shall be directly responsible for appointing, compensating, retaining, overseeing and, where appropriate, replacing the independent auditor. The independent auditor will report directly to the Audit Committee. The Audit Committee has sole authority to approve the hiring and discharging of the independent auditor, all audit engagement fees and terms and all permissible non-audit engagements with the independent auditor. The Audit Committee will also appoint, retain, compensate, oversee and, where appropriate, replace any other registered public accounting firm engaged for the purpose of preparing or issuing an audit report or performing other audit, review or attest services for the Company.

- **Supervise and Evaluate the Independent Auditor**. The Audit Committee will:

  o   Oversee and, at least annually, evaluate the work of the independent auditor or any other registered public accounting firm engaged for the purpose of preparing or issuing an audit report or performing other audit, review or attest services for the Company, which evaluation shall include a review and evaluation of the lead partner of the independent auditor.  The Audit Committee shall review, in consultation with the independent auditor, the annual audit plan and scope of audit activities and monitor such plan's progress.

  o   Review and resolve any disagreements that may arise between management and the independent auditor regarding internal control over financial reporting or financial reporting.

  o   At least annually, obtain and review a report by the independent auditor that describes (i) the independent auditor's internal quality control procedures, and (ii) any material issues raised by the most recent internal quality-control review, or peer review, of the independent auditor or by any inquiry or investigation by governmental or professional authorities, within the preceding five years, regarding any independent audit performed by the independent auditor, and any steps taken to deal with any such issues.

- **Evaluate the Independence of the Independent Auditor**. The Audit Committee will:

  o   Review and discuss with the independent auditor the written independence disclosures required by the applicable requirements of the Public Company Accounting Oversight Board or other regulatory body.

  o   Review and discuss with the independent auditor at least annually any relationships or services (including permissible non-audit services) that may affect its objectivity and independence.

  o   Oversee the rotation of the independent auditor's lead audit and concurring partners and the rotation of other audit partners, with applicable time-out periods, in accordance with applicable law.

o        Take appropriate action to oversee the independence of the independent auditor.

- **Approve Audit and Non-Audit Services and Fees**. The Audit Committee shall (i) review and approve, in advance, the scope and plans for the audits and the audit fees and (ii) approve in advance (or, where permitted under the rules and regulations of the SEC, subsequently) all non-audit and tax services to be performed by the independent auditor that are not otherwise prohibited by law or regulations and any associated fees. The Audit Committee shall also approve all audit and permitted non-audit and tax services that may be provided by other registered public accounting firms. The Audit Committee may, in accordance with applicable law, establish pre-approval policies and procedures for the engagement of independent accountants and any other registered public accounting firm to render services to the Company.

- **Review Financial Statements**. The Audit Committee shall review and discuss the following with management, the internal auditors, if applicable, and the independent auditor, as applicable:

    o        The scope and timing of the annual audit of the Company's financial statements.

    o        The Company's annual audited and quarterly unaudited financial statements and annual and quarterly reports on Form 10-K and 10-Q, including the disclosures in "Management's Discussion and Analysis of Financial Condition and Results of Operations", and recommend to the Board whether the audited financial statements and "Management's Discussion and Analysis of Financial Condition and Results of Operations" should be included in the Company's Form 10-K.

    o        The results of the independent audit and the quarterly reviews of the Company's financial statements, and the independent auditor's opinion on the audited financial statements.

    o        The reports and certifications regarding internal control over financial reporting and disclosure controls and procedures.

    o        Major issues regarding accounting principles and financial statement presentation, including any significant changes in the Company's selection or application of accounting principles.

    o        Analyses prepared by management or the independent auditor setting forth significant financial reporting issues and judgments made in connection with the preparation of the financial statements, including analyses of the effects of alternative GAAP methods on the financial statements.

    o        The effect of regulatory and accounting initiatives, as well as off-balance sheet structures, on the Company's financial statements.

    o        Any significant changes required or taken in the audit plan as a result of any material control deficiency.

o     Any problems or difficulties the independent auditor encountered in the course of its audit work, including any restrictions on the scope of the auditor's activities or on access to requested information, and management's response.

o     Any significant disagreements between management and the independent auditor.

- Reports and Communications from the Independent Auditor. The Audit Committee shall review and discuss reports from the independent auditor concerning the following:

  o     Critical accounting policies and practices to be used by the Company.

  o     Alternative treatments of financial information within GAAP that the auditor has discussed with management, ramifications of the use of these alternative disclosures and treatments, and the treatment preferred by the independent auditor if different from that used by management.

  o     Any material written communications between the independent auditor and management, such as any management letter or schedule of unadjusted differences.

  o     Any matters required to be communicated to the Audit Committee under generally accepted auditing standards and other legal or regulatory requirements.

- Audit Committee Report. The Audit Committee will prepare the report of the Audit Committee that SEC rules require to be included in the Company's annual proxy statement.

- Earnings Press Releases and Earnings Guidance. The Audit Committee will review, in general, earnings press releases, and review and discuss with management and the independent auditors policies with respect to earnings press releases (with particular attention to any use of "pro forma" or "adjusted" non-GAAP information), financial information and earnings guidance provided to the public, analysts and ratings agencies.

- Internal Controls. The Audit Committee shall review and discuss with management, the internal auditors, if applicable, and the independent auditor the adequacy and effectiveness of the Company's internal controls, including any changes, significant deficiencies or material weaknesses in those controls reported by the independent auditor, the internal auditors, if applicable, or management and any special audit steps adopted in light of any material control deficiencies, and any fraud, whether or not material, that involves management or other Company employees who have a significant role in the Company's internal controls.

- Disclosure Controls and Procedures. The Audit Committee shall review and discuss the adequacy and effectiveness of the Company's disclosure controls and procedures.

- <u>Internal Audit</u>. The Audit Committee shall:

    o   Review with the independent auditor a discussion of management's plans with respect to the responsibilities, budget and staffing of the internal audit function and the Company's plans for the implementation of the internal audit function.

- <u>Legal and Regulatory Compliance</u>. The Audit Committee shall:

    o   Review and discuss with management, the internal auditors, if applicable, and the independent auditor (i) the overall adequacy and effectiveness of the Company's legal, regulatory and ethical compliance programs, including the Company's Code of Business Conduct & Ethics, compliance with anti-bribery and anti-corruption laws and regulations, and compliance with export control regulations and (ii) reports regarding compliance with applicable laws, regulations and internal compliance programs.

    o   Discuss with management and the independent auditor any correspondence with regulators or governmental agencies and any published reports that raise material issues regarding the Company's financial statements or accounting policies.

    o   Discuss with the Company's senior legal officer any legal matters that may have a material impact on the financial statements or the Company's compliance procedures.

- <u>Complaints</u>. The Audit Committee shall establish and oversee procedures for the receipt, retention and treatment of complaints on accounting, internal accounting controls or audit matters, as well as for confidential and anonymous submissions by the Company's employees concerning questionable accounting or auditing matters.

- <u>Risk Assessment and Risk Management</u>.  The Audit Committee shall review and discuss with management, the internal auditors, if applicable, and the independent auditor the Company's major financial risk exposures and the steps management has taken to monitor and control those exposures, including the Company's guidelines and policies with respect to risk assessment and risk management.

- <u>Related Party Transactions</u>. The Audit Committee shall review and oversee all transactions between the Company and a related person (as defined in Item 404 of Regulation S-K), in accordance with the Company's policies and procedures.

- <u>Hiring of Auditor Personnel</u>. The Audit Committee shall set hiring policies with regard to employees and former employees of the independent auditor and oversee compliance with such policies.

- <u>Committee Charter Review</u>. The Audit Committee shall review and reassess the adequacy of this charter annually and shall submit any recommended changes to the charter to the Board for approval.

- Performance Review. The Audit Committee shall review and assess the performance of the Audit Committee on an annual basis.

    The function of the Audit Committee is primarily one of oversight. The Company's management is responsible for preparing the Company's financial statements, and the independent auditor is responsible for auditing and reviewing those financial statements. The Audit Committee is responsible for assisting the Board in overseeing the conduct of these activities by management and the independent auditor. The Audit Committee is not responsible for providing any expert or special assurance as to the financial statements or the independent auditor's work. It is recognized that the members of the Audit Committee are not full-time employees of the Company, that it is not the duty or responsibility of the Audit Committee or its members to conduct "field work" or other types of auditing or accounting reviews or procedures or to set auditor independence standards, and that each member of the Audit Committee shall be entitled to rely on (i) the integrity of those persons and organizations within and outside the Company from which the Audit Committee receives information and (ii) the accuracy of the financial and other information provided to the Audit Committee, in either instance absent actual knowledge to the contrary.

125.     Upon information and belief, the Company maintained an Audit Committee Charter during the Relevant Period that imposed the same, or substantially and materially the same or similar, duties on the members of the Audit Committee as those set forth above.

**Duties Pursuant to the Company's Code of Business Conduct and Ethics**

126.     Additionally, the Individual Defendants, as officers and/or directors of Twitter, are bound by the Company's Code of Business Conduct and Ethics (the "Code"), which includes guidelines developed "around the recognition that everything we do in connection with our work should be measured against the highest possible standards of ethical business conduct," among other things.   Twitter's employees, board members, officers, independent contractors, and consultants must follow the Code.

127.     According to the Code:

    Financial integrity and fiscal responsibility is everyone's personal responsibility. The money we spend for Twitter is not ours; it belongs to the company's and, ultimately, our shareholders'. Each person at Twitter – not just those in Finance – has a role in making sure that money is appropriately spent, our financial records are complete and accurate and our internal controls are honored. This matters every time we hire a new vendor, expense something to Twitter, sign a new business contract or enter into any deals on Twitter's behalf.

> Twitter maintains a system of internal controls to reinforce our compliance with legal, accounting, tax and other regulatory requirements in every location in which we operate. Stay in compliance with our system of internal controls, and don't hesitate to contact Legal or Finance if you have any questions.

128. Upon information and belief, the Company maintained a version of the Code during the Relevant Period that imposed the same, or substantially and materially the same or similar, duties on, among others, the Board as those set forth above.

**Control, Access, and Authority**

129. The Individual Defendants, because of their positions of control and authority as directors and/or officers of Twitter, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by Twitter.

130. Because of their advisory, executive, managerial, and directorial positions with Twitter, each of the Individual Defendants had access to adverse, non-public information about the financial condition, operations, and improper representations of Twitter.

131. At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of Twitter, and was at all times acting within the course and scope of such agency.

**Reasonable And Prudent Supervision**

132. To discharge their duties, the officers and directors of Twitter were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the financial affairs of the Company. By virtue of such duties, the officers and directors of Twitter were required to, among other things:

(a)     ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the investing public;

(b)     conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)     properly and accurately guide stockholders and analysts as to the true financial and business prospects of the Company at any given time, including making accurate statements about the Company's business and financial prospects and internal controls;

(d)     remain informed as to how Twitter conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiry in connection therewith, and take steps to correct such conditions or practices and make such disclosures as necessary to comply with securities laws; and

(e)     ensure that Twitter was operated in a diligent, honest, and prudent manner in compliance with all applicable laws, rules, and regulations.

## BREACHES OF DUTIES

133.    Each Individual Defendant, by virtue of his or her position as a director and/or officer, owed to Twitter and its stockholders the fiduciary duties of loyalty and good faith, and the exercise of due care and diligence in the management and administration of the affairs of Twitter, as well as in the use and preservation of its property and assets.  The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of Twitter, the absence of good faith on their part, and a reckless disregard for their duties to Twitter and its stockholders that the Individual Defendants were aware, or should

have been aware, posed a risk of serious injury to Twitter. The conduct of the Individual Defendants who were also officers and/or directors of the Company have been ratified by the remaining Individual Defendants who collectively comprised all of Twitter's Board.

134. The Individual Defendants each breached their duties of loyalty and good faith by allowing defendants to cause, or by themselves causing, the Company to make false and/or misleading statements that misled stockholders into believing that disclosures related to the Company's financial and business prospects were truthful and accurate when made.

135. In addition, as a result of the Individual Defendants' illegal actions and course of conduct, the Company is now the subject of the Securities Class Action that alleges violations of the federal securities laws. As a result, Twitter has expended, and will continue to expend, significant sums of money to rectify the Individual Defendants' wrongdoing.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

136. In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing. The Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

137. During all times relevant hereto, the Individual Defendants collectively and individually initiated a course of conduct that was designed to mislead stockholders into believing that the Company's business and financial prospects were better than they actually were. In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein.

138. The purpose and effect of the Individual Defendants' conspiracy, common enterprise, and/or common course of conduct was, among other things, to: (a) disguise the

Individual Defendants' violations of law, including breaches of fiduciary duties and unjust enrichment; and (b) disguise and misrepresent the Company's actual business and financial prospects.

139. The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company to purposefully, recklessly, or negligently release improper statements. Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

140. Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commissions of the wrongdoing complained of herein, each Individual Defendant acted with knowledge of the primary wrongdoing, substantially assisted the accomplishment of that wrongdoing, and was aware of his or her overall contribution to and furtherance of the wrongdoing.

## DAMAGES TO TWITTER

141. As a result of the Individual Defendants' wrongful conduct, Twitter disseminated false and misleading statements and omitted material information to make such statements not false and misleading when made. The improper statements have devastated Twitter's credibility. Twitter has been, and will continue to be, severely damaged and injured by the Individual Defendants' misconduct.

142. As a direct and proximate result of the Individual Defendants' actions as alleged above, Twitter's market capitalization has been substantially damaged, having lost billions of dollars in value as a result of the conduct described herein.

143.     Further, as a direct and proximate result of the Individual Defendants' conduct, Twitter has expended, and will continue to expend, significant sums of money.  Such expenditures include, but are not limited to:

(a)     costs incurred in investigating and defending Twitter and certain officers in the pending Securities Class Action, plus potentially hundreds of millions of dollars in settlement or to satisfy an adverse judgment;

(b)     costs incurred by the Company in connection with the SEC investigation into its public disclosures;

(c)     costs incurred from compensation and benefits paid to the Individual Defendants, which compensation was based at least in part on Twitter's artificially-inflated stock price; and

(d)     costs incurred from the loss of the Company's customers' confidence in Twitter's products and services.

144.     Twitter's performance issues also damaged its reputation within the business community and in the capital markets.  In addition to price, Twitter's current and potential customers consider a company's ability to accurately value its business prospects, evaluate growth potential, and disclose appropriate and relevant customer metrics.  Businesses are less likely to award contracts to companies that are uncertain about their own financial conditions and operations.  Given the substantial market capitalization loss Twitter incurred as a result of the improper statements, Twitter's ability to raise equity capital or debt on favorable terms in the future is now seriously impaired.  In addition, the Company stands to incur higher marginal costs of capital and debt because the improper statements and misleading projections disseminated by the

Individual Defendants have materially increased the perceived risks of investing in and lending money to the Company.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

145.     Plaintiffs bring this action derivatively in the right and for the benefit of Twitter to redress injuries suffered, and to be suffered, by Twitter as a direct result of the Individual Defendants' breaches of fiduciary duties and unjust enrichment, as well as the aiding and abetting thereof, by the Individual Defendants.  Twitter is named as a nominal defendant solely in a derivative capacity.

146.     Plaintiffs will adequately and fairly represent the interests of Twitter in enforcing and prosecuting its rights.

147.     Plaintiffs were each stockholders of Twitter common stock at the time of the wrongdoing of which Plaintiffs complain, and have been continuously since.

148.     At the time this action was commenced, the Board of Twitter was comprised of the following ten (10) directors: defendants Dorsey, Fenton, Rosenblatt, Scardino, and Williams, and Non-Party Directors Kordestani, Martha Lane Fox, Hugh F. Johnston, Debra L. Lee, and Bret Taylor.  A majority of these directors are not disinterested and independent with respect to the acts and omissions alleged herein.  Notably, at least half of the current board faces a substantial likelihood of personal liability for their breaches of the duties of trust, loyalty, good faith, candor, oversight, reasonable inquiry, supervision, and due care described herein.  Where a plaintiff alleges that at least half of the members of the current board are not independent or disinterested, demand is excused as futile.

149.     Plaintiffs have not made a pre-suit demand on the Board to institute this action because such a demand would have been a futile, wasteful, and useless act, as set forth below.

**Demand Is Futile as to Defendants Dorsey, Fenton, Rosenblatt, Scardino, and Williams Because They Face a Substantial Likelihood of Liability**

A. **Breaches of Fiduciary Duty and Violations of Section 14(a) of the Exchange Act for Misstatements and Omissions**

150. Demand is futile because defendants Dorsey, Fenton, Rosenblatt, Scardino, and Williams face a substantial likelihood of liability for their individual misconduct, specifically, for breaches of fiduciary duty due to the Company's materially false and misleading misstatements and omissions detailed herein.

151. Defendants Dorsey, Fenton, Rosenblatt, Scardino, and Williams knew that on November 12, 2014, the Company announced that it would no longer be reporting Timeline Views, and that no other meaningful user engagement metrics, *e.g.*, DAU and DAU/MAU metrics, were being reported in place of Timeline Views in the Company's SEC filings or other public statements, including the 2014 10-K (which they signed), Proxy, Q1 2015 10-Q, and the earnings and press releases detailed herein, despite the Company acknowledging the importance of assessing user engagement in order to evaluate the Company's overall business.











158.    Defendants Dorsey, Fenton, Rosenblatt, Scardino, and Williams, as directors (and, in some cases, also as Audit Committee members), owed a duty to, in good faith and with due diligence, exercise reasonable inquiry, oversight, and supervision to ensure that the Company's internal controls and/or internal auditing and accounting controls over financial reporting were sufficiently robust and effective (and/or were being implemented effectively), and to ensure that the Audit Committee's duties were being discharged in good faith and with the required diligence and due care.  Instead, they knowingly and/or with reckless disregard reviewed, authorized, and/or caused the publication of materially false and misleading statements throughout the Relevant Period that caused the Company's stock to trade at artificially inflated prices.

159.    In violation of these fiduciary duties, however, defendants Dorsey, Fenton, Rosenblatt, Scardino, and Williams, contemporaneously with their review of the Company's

internal MAU, DAU, and DAU/MAU metrics discussed above, caused Twitter to file: (i) the 2014 10-K on March 2, 2015; (ii) the Proxy on April 20, 2015; (iii) the Q1 2015 10-Q on April 28, 2015; and (iv) the other earnings and press releases detailed herein, all of which concealed the Company's primary internal metric for assessing user engagement, DAUs, and failed to disclose the Company's negatively trending user growth and user engagement. Moreover, the Proxy also contained false and misleading information and/or omitted material information concerning the Board's and certain of its committees' failures in fulfilling their duties with respect to, *inter alia*, oversight of internal controls and disclosures. As such, defendants Dorsey, Fenton, Rosenblatt, Scardino, and Williams each face a substantial likelihood of liability for breaches of fiduciary duty and violations of section 14(a) of the Exchange Act.

### B.  Waste of Corporate Assets Resulting from the Securities Class Action

160.  Moreover, as a result of defendants Dorsey, Fenton, Rosenblatt, Scardino, and Williams's misconduct detailed above, the Company is now the subject of the Securities Class Action, subjecting the Company to potentially millions of dollars in legal liability and litigation costs to defend the Individual Defendants, thereby wasting significant corporate assets. *See* ¶¶116-118, *supra*. Demand is also futile on this ground.

### C.  Waste of Corporate Assets Resulting from Awarding Excessive Compensation

161.  Defendants Dorsey, Scardino, Fenton, Rosenblatt, and Williams, and in particular, defendants Fenton and Rosenblatt as Compensation Committee members, face a substantial likelihood of liability for waste of corporate assets on the separate and independent basis that they approved and awarded excessive compensation, bonuses, and termination payments to certain of Twitter's executive officers and themselves.

162.  Of the executive officers receiving unwarranted and unjustifiable compensation at the Director Defendants' direction of defendants Dorsey, Scardino, and Williams, and particularly

at the direction of defendants Fenton and Rosenblatt as Compensation Committee members, perhaps the most notable is defendant Noto, ████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

██████████    █████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

defendants Dorsey, Scardino, Fenton, Rosenblatt, and Williams approved a roughly *50%* increase in defendant Noto's base salary, from $250,000 in 2015 to approximately $500,000 in 2016, and awarded him *more than $23 million* in stock awards in 2016, up from zero in 2015, resulting in a more than *5,800% increase* in defendant Noto's total compensation from 2015 to 2016.

163. As to the Company's non-employee directors, including defendants Fenton, Scardino, Rosenblatt, and Williams, each paid themselves a lavish annual retainer of approximately $225,000 in restricted stock units, plus a *quarterly* cash fee of $12,500, purely for serving as Board members.

164. The exorbitant remunerations paid to the Company's wayward fiduciaries who breached their fiduciary duties to the Company were improper and unnecessary, constituted gross waste of corporate assets, and no person of ordinary, sound business judgment would view this exchange of consideration for services rendered as fair or reasonable.

### D. Unjust Enrichment

165. As a result of the extravagant and unjustifiable compensation they personally received and that they awarded to other Company executives ████████████████████ ████████████████████████████████████ and while knowing of the Company's negatively trending user engagement and user growth, defendants Dorsey, Fenton, Rosenblatt, Scardino, and Williams unjustly enriched themselves while breaching their fiduciary duties owed to Twitter.

166. In sum, defendants Dorsey, Fenton, Rosenblatt, Scardino, and Williams's making or authorization of false and misleading statements during the Relevant Period, failure to timely correct such statements, failure to take necessary and appropriate steps to ensure that the Company's internal controls or internal auditing and accounting controls were sufficiently robust and effective (and/or were being implemented effectively), failure to take necessary and appropriate steps to ensure that the Audit Committee's and Compensation Committee's duties were being discharged in good faith and with the required diligence, and/or acts of corporate waste and abuse of control, constitute breaches of fiduciary duties and waste of corporate assets, violated section 14(a) of the Exchange Act, and unjustly enriched defendants Dorsey, Fenton, Rosenblatt, Scardino, and Williams, for which they face a substantial likelihood of liability. If defendants Dorsey, Fenton, Rosenblatt, Scardino, and Williams were to bring a suit on behalf of Twitter to recover damages sustained as a result of this misconduct, they would expose themselves to significant liability. This is something they will not do. For this reason, demand is futile.

**Demand Is Futile as to Defendants Fenton and Scardino as Audit Committee Members**

167.    Pursuant to the Audit Committee's charter, Audit Committee members, including defendants Fenton and Scardino, were responsible for, among other things, reviewing and approving quarterly and annual financial statements and earnings press releases, overseeing Twitter's internal controls over financial reporting, and discharging their other duties described herein. ██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████████████████████

168.    Notwithstanding, the Audit Committee Defendants knowingly or recklessly reviewed and approved, or failed to exercise due diligence and reasonable care in reviewing and preventing the dissemination of false and/or materially misleading earnings press releases and earnings guidance, and failed in their specific duties to ensure that the Company's internal controls over financial reporting were sufficient and that statements made by the Company regarding its business and financial prospects were accurate.  *See, e.g.*, ¶¶56-87, 109, 122-125.  Accordingly, the Audit Committee Defendants face a substantial likelihood of liability for breach of their fiduciary duties of loyalty and good faith.  Any demand upon the Audit Committee Defendants therefore is futile.

**Demand Is Futile as to Defendant Dorsey and Non-Party Director Kordestani Because They Are Not Independent**

169.  Demand is also futile as to defendant Dorsey and Non-Party Director Kordestani because, as the Company admits, neither defendant Dorsey nor Non-Party Director Kordestani meet the Company's standards for director independence.  As stated in various of the Company's Proxy Statements filed with the SEC (*e.g.*, the Proxy Statements filed with the SEC on April 15, 2020; April 8, 2019; April 11, 2018; April 7, 2017; and April 15, 2016) the Company has admitted that defendant Dorsey, as Twitter's CEO, and Kordestani, as its Executive Chairman, do not meet the standards of director independence as defined by the New York Stock Exchange.

170.  In addition, by virtue of their roles at Twitter as CEO and Executive Chairman, respectively, defendant Dorsey and Kordestani derive a substantial portion of their income from their employment with Twitter.  Indeed, Kordestani received a whopping $12,361,615 in total compensation from Twitter in 2015, despite having worked at Twitter for less than three months that year.  Notably, this figure does not include the lucrative stock options and performance-based restricted stock units that were granted to Kordestani as part of his employment compensation package.  Likewise, while defendant Dorsey receives a *de minimus* salary in his role as CEO, he has consistently maintained a significant ownership stake in the Company—over 2%—throughout the Relevant Period.  Indeed, as of the date of the filing of this action, defendant Dorsey beneficially owned 3.4% of the Company's outstanding shares, for an approximate value of $23.7 million; according to Twitter's last Proxy Statement filed on April 15, 2020, defendant Dorsey is most recently reported as owning 2.3% of the Company's outstanding shares.  Today, those shares have an approximate value of nearly $600 million.  Moreover, as the co-founder and CEO of Twitter, as well as a director, defendant Dorsey exercises significant control over the Company, and thus the value of his holdings of Twitter stock.

171.     Accordingly, and as alleged in more detail herein, both Dorsey and Kordestani have financially benefitted from the wrongdoing of the Individual Defendants, and both of their livelihoods and fortunes continue to depend on their ongoing employment from Twitter and the goodwill of their fellow directors.[8]   Thus, neither Dorsey nor Kordestani is independent or disinterested, and demand is futile as to them.

**Demand Is Futile Based on Insider Selling as to Defendants Dorsey and Williams**

172.     Demand is futile as to defendants Dorsey and Williams because, as alleged herein, each engaged in insider trading activity at a time when each of them knew of adverse, material, non-public information about the Company's financial outlook that was not being disclosed to the stockholders.

173.     On the basis of this non-public information, defendants Dorsey and Williams timed their sales to maximize profit from Twitter's then artificially inflated stock price.  As a result of their illicit insider stock sales, defendants Dorsey and Williams each received direct financial benefits not shared with Twitter stockholders.   Indeed, defendants Dorsey and Williams collectively reaped more than $276 million in proceeds from the sale of their personal stock holdings.  Therefore, defendants Dorsey and Williams are directly interested in a demand.

174.     Defendant Williams's sales are particularly egregious.   As discussed herein,

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

---

[8] Indeed, the Director Defendants constitute five out of ten directors sitting on the Board as of the filing of this action.

Nevertheless, on the *same* day, defendant Williams disposed of 233,900 shares of personally held Twitter common stock at an average price of $49.62 per share, reaping in ***more than $11.5 million*** in illicit insider trading proceeds in a ***single*** trading day. In the months after ███████████ ███████████ defendant Williams continued to take advantage of his inside knowledge. Specifically, between March 5, 2015 and April 24, 2015, defendant Williams sold over an additional 2.3 million shares averaging approximately $48.79 per share. By the time the truth was fully revealed on July 29, 2015, Twitter's stock price had fallen dramatically, to close at $31.24, and thereafter into the third quarter of 2015, Twitter's stock was consistently trading at more than $18 less per share (at under $30 per share), compared to when defendant Williams sold. All told, in the roughly two months ***after*** ████████████████████ defendant Williams gained over ***$45 million*** from insider sales.[9] This, despite the fact that just months prior to the start of the Relevant Period, on April 14, 2014, Twitter filed a Form 8-K with the SEC announcing that defendant Williams had no "current plans to sell" his shares in the Company.

175. Further, defendants Dorsey and Williams are interested in a demand because they face a substantial likelihood of liability for their breaches of fiduciary duties of loyalty and good faith based on their challenged insider sales.

176. As such, demand upon defendants Dorsey and Williams is futile.

**Demand Is Futile as to All Directors for Additional Reasons**

177. The current Board of Twitter has already demonstrated that it cannot independently and disinterestedly consider a pre-suit demand to bring the claims set forth herein. Despite the wrongdoing of the Company's executive officers, including defendant Noto, who was allowed to

---

[9] As discussed herein, defendant Williams's ***total*** insider sales proceeds during the Relevant Period, however, exceed ***$270 million.***

continue to serve as Twitter's CFO until his resignation in August 2017, and as COO until his resignation in February 2018, the Board has taken no action to address the harm this misconduct has caused to the Company.

178. Moreover, as discussed above, each of the Company's non-employee directors, including defendants Fenton, Scardino, Rosenblatt, and Williams, received a lavish annual retainer of approximately $225,000 in restricted stock units, plus a *quarterly* cash fee of $12,500, purely for serving as Board members. In addition, members and chairpersons of the Company's standing committees, including the Audit Committee and Compensation Committee, receive additional sums in the thousands of dollars for their committee memberships. This compensation provides a substantial stipend to these directors, from which each of them personally benefits and depends on for his or her livelihood. Demand on each of the directors is futile because they have demonstrated through their course of conduct to date their unwillingness to undertake any action that would threaten the economic benefits they receive as members of Twitter's Board.

179. To the extent Twitter's current officers and directors are protected against personal liability for their breaches of fiduciary duties alleged in this complaint by Directors & Officers Liability Insurance ("D&O Insurance"), they caused the Company to purchase that insurance for their protection with corporate funds, *i.e.*, monies belonging to Twitter stockholders. ████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████

[REDACTED]

181. Under the factual circumstances described herein, at least half of the Board is more interested in protecting themselves than they are in protecting Twitter by prosecuting this action. Therefore, demand on Twitter and its Board is futile and is excused.

182. Twitter has been, and will continue to be, exposed to significant losses due to the Individual Defendants' wrongdoing. Yet, defendants Dorsey, Fenton, Scardino, Rosenblatt, and Williams have not filed any lawsuits against themselves or others who were responsible for the wrongful conduct. Thus, these defendants are breaching their fiduciary duties to the Company and face a substantial likelihood of liability for their breaches, rendering any demand upon them futile.

183. Plaintiffs have not made any demand on stockholders of Twitter to institute this action since such demand would be a futile and useless act for the following reasons:

      (a)    Twitter is a publicly traded company with thousands of stockholders of record and at least hundreds of thousands of beneficial owners;

      (b)    making a demand on such a number of stockholders would be impossible for Plaintiffs, who have no means of collecting the names, addresses, or phone numbers of Twitter stockholders; and

(c) making a demand on all stockholders would force Plaintiffs to incur excessive expenses and obstacles, assuming all stockholders could even be individually identified with any degree of certainty.

## COUNT I

**Against Director Defendants Dorsey, Fenton, Rosenblatt, Scardino, Williams, Costolo, Chernin and Currie for Violations of Section 14(a) of the Exchange Act**

184. Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

185. The section 14(a) Exchange Act claims alleged herein are based solely on negligence. They are not based on any allegation of reckless or knowing conduct by or on behalf of Director Defendants Dorsey, Fenton, Rosenblatt, Scardino, Williams, Costolo, Chernin, and Currie. The section 14(a) Exchange Act claims alleged herein do not allege and do not sound in fraud. Plaintiffs specifically disclaim any allegations of, reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to the non-fraud claims.

186. Section 14(a) of the Exchange Act, 15 U.S.C. §78n(a), provides that "[i]t shall be unlawful for any person, by use of the mails or by means of instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l]."

187. Rule 14a-9, promulgated pursuant to section 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or

which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9.

188. Director Defendants Dorsey, Fenton, Rosenblatt, Scardino, Williams, Costolo, Chernin, and Currie negligently issued, caused to be issued, and participated in the issuance of materially misleading written statements to stockholders which were contained in the Proxy. The Proxy contained a proposal to Twitter's stockholders urging stockholders to re-elect defendants Rosenblatt and Williams to the Board. The Proxy, however, misrepresented and failed to disclose that: (i) the Board was ineffective in overseeing Twitter's business affairs; (ii) the Audit Committee was ineffective in fulfilling its oversight responsibilities with respect to internal control over financial reporting and disclosure controls and procedures; (iii) the Nominating and Corporate Governance Committee was ineffective in evaluating the performance of the Board and the adequacy of Twitter's corporate governance practices and reporting; (iv) by early 2015, Twitter and the Individual Defendants were regularly providing misleading disclosures concerning the critical metrics of user engagement and user growth, both of which were flat or declining; and (v) Twitter was failing to disclose any adequate metrics to guide the public with respect to user engagement. By reasons of the conduct alleged herein, Director Defendants Dorsey, Fenton, Rosenblatt, Scardino, Williams, Costolo, Chernin, and Currie violated section 14(a) of the Exchange Act. As a direct and proximate result of these Director Defendants' wrongful conduct, Twitter misled and/or deceived its stockholders by making misleading statements that were an essential link in stockholders heeding Twitter's recommendation to re-elect defendants Rosenblatt and Williams to the Board.

189. The misleading information contained in the Proxy was material to Twitter's stockholders in determining whether or not to elect defendants Rosenblatt and Williams. This

information was also material to the integrity of these directors that were proposed for election to the Board. The proxy solicitation process in connection with the Proxy was an essential link in the re-election of nominees to the Board.

190. Plaintiffs, on behalf of Twitter, thereby seek relief for damages inflicted upon the Company based upon the misleading Proxy in connection with the improper re-election of the members of the Board.

## COUNT II

### Against the Individual Defendants for Breach of Fiduciary Duties

191. Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

192. The Individual Defendants owed and owe Twitter fiduciary obligations. By reason of their fiduciary relationships, the Individual Defendants owed and owe Twitter the highest obligation of good faith, fair dealing, loyalty, due care, reasonable inquiry, oversight, and supervision.

193. The Individual Defendants violated and breached their fiduciary duties of good faith, fair dealing, loyalty, due care, reasonable inquiry, oversight, and supervision.

194. The Individual Defendants each knowingly, recklessly, or negligently approved the issuance of false statements that misrepresented and failed to disclose material information concerning the Company. These actions could not have been a good faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

195. As a direct and proximate result of the Individual Defendants' failure to perform their fiduciary obligations, Twitter has sustained significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

196.  Plaintiffs, on behalf of Twitter, have no adequate remedy at law.

## COUNT III

### Against the Individual Defendants for Unjust Enrichment

197.  Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

198.  By their wrongful acts and omissions, the Individual Defendants were unjustly enriched at the expense of and to the detriment of Twitter.

199.  The Individual Defendants were unjustly enriched as a result of the compensation they received while breaching their fiduciary duties owed to Twitter.

200.  Plaintiffs, as stockholders and representatives of Twitter, seek restitution from defendants and seek an order from this Court disgorging all profits, benefits, and other compensation obtained by the Individual Defendants from their wrongful conduct and fiduciary breaches.

201.  Plaintiffs, on behalf of Twitter, have no adequate remedy at law.

## COUNT IV

### Against the Individual Defendants for Waste of Corporate Assets

202.  Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

203.  The wrongful conduct alleged regarding the issuance of false and misleading statements was continuous, connected, and on-going throughout the Relevant Period.  It resulted in continuous, connected, and on-going harm to the Company.

204.  As a result of the misconduct described above, the Individual Defendants wasted corporate assets by: (i) by paying excessive compensation, bonuses, and termination payments to

certain of its executive officers; (ii) awarding self-interested stock options to certain officers and directors; and (iii) incurring potentially millions of dollars of legal liability and/or legal costs to defend the Individual Defendants' unlawful actions.

205.    As a result of the waste of corporate assets, the Individual Defendants are liable to the Company.

206.    Plaintiffs, on behalf of Twitter, have no adequate remedy at law.

## COUNT V

**Against the Insider Selling Defendants Dorsey and Williams for Breach of Fiduciary Duty for Insider Selling and Misappropriation of Information**

207.    Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

208.    At the time the Insider Selling Defendants sold their Twitter stock, they knew the information described above, and sold Twitter stock on the basis of such information.

209.    The information described above was proprietary non-public information concerning the Company's financial condition and future business prospects.  It was a proprietary asset belonging to the Company, which the Insider Selling Defendants misappropriated to their own benefit when they sold Twitter stock.

210.    The Insider Selling Defendants' sales of stock while in possession and control of this material, adverse, non-public information was a breach of their fiduciary duties of loyalty and good faith.

211.    Since the use of the Company's proprietary information for their own gain constitutes a breach of the Insider Selling Defendants' fiduciary duties, the Company is entitled to the imposition of a constructive trust on any profits the Insider Selling Defendants obtained thereby.

212.     Plaintiffs, on behalf of Twitter, have no adequate remedy at law.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs demand judgment as follows:

A.     Against all defendants for the amount of damages sustained by the Company as a result of defendants' violations of federal law, breaches of fiduciary duties, unjust enrichment, waste of corporate assets, and insider selling;

B.     Directing Twitter to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect Twitter and its stockholders from a repeat of the damaging events described herein, including but not limited to putting forward for stockholder vote resolutions for amendments to the Company's By-Laws or Articles of Incorporation, and taking such other action as may be necessary to place before stockholders for a vote the following corporate governance proposals or policies:

- a proposal to strengthen the Board's supervision of operations and compliance with applicable state and federal laws and regulations;

- a proposal to strengthen the Company's internal reporting and financial disclosure controls;

- a proposal to develop and implement procedures for greater stockholder input into the policies and guidelines of the Board;

- a proposal to ensure the accuracy of the qualifications of Twitter's directors, executives and other employees;

- a proposal to require an independent Chairman of the Board;

- a provision to permit the stockholders of Twitter to nominate at least three candidates for election to the Board to replace existing directors;

- a proposal to strengthen the Company's oversight and controls over insiders' purchase and sale of Company stock;

- a proposal to strengthen the Company's procedures for the receipt, retention, and treatment of complaints received by the Company regarding internal controls; and

- a provision to appropriately test and then strengthen the Company's internal operational control functions;

C.    Awarding to Twitter restitution from the Individual Defendants, and ordering disgorgement of all profits, benefits, and other compensation obtained by the Individual Defendants;

D.    Awarding to Plaintiffs the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

E.    Granting such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiffs demand a trial by jury.

Dated: July 2, 2020            **COOCH AND TAYLOR, P.A.**

*/S/ Blake A. Bennett*
Blake A. Bennett (#5133)
The Nemours Building
1007 N. Orange St., Suite 1120
Wilmington, Delaware 19801
(302) 984-3800
bbennett@coochtaylor.com

**ROBBINS LLP**
BRIAN J. ROBBINS
SHANE P. SANDERS
5040 Shoreham Place
San Diego, CA 92122
(619) 525-3990
brobbins@robbinsllp.com
ssanders@robbinsllp.com

**JOHNSON FISTEL, LLP**
FRANK J. JOHNSON
600 West Broadway, Suite 1540
San Diego, CA 92101
(619) 230-0063
frankj@johnsonfistel.com

*Attorneys for Plaintiffs*

1462528